**LABOR YOUTH LEAGUE, Petitioner,**

v.

**SUBVERSIVE ACTIVITIES CONTROL
BOARD, Respondent.**

No. 12642.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 9, 1962.

Decided April 25, 1963.

Mr. Samuel Gruber, Stamford, Conn., of the bar of the Supreme Court of Connecticut, pro hac vice, by special leave of court, with whom Mr. James T. Wright, Washington, D. C., was on the brief, for petitioner.

Messrs. Kevin T. Maroney and George B. Searls, Attorneys, Department of Justice, for respondent. Mr. Frank R. Hunter, Jr., General Counsel, Subversive Activities Control Board, was on the brief for respondent. Mr. John F. Lally, Attorney, Department of Justice, and Mr. Harold D. Rhynedance, Jr., Asst. U. S. Atty. at the time the record was filed, also entered appearances for respondent.

Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and DANAHER, Circuit Judge.

PRETTYMAN, Senior Circuit Judge.

This is a petition for review of an order of the Subversive Activities Control Board. The Attorney General alleged, and the Board found, that our petitioner, the Labor Youth League, was a "Communist-front organization" and should be registered as such. The Government argues here that the organization still meets that definition. Ten similar cases, filed in this court, have been held in abeyance pending final disposition of the order requiring registration of the Communist Party of the United States. The nature of a Communist-front organization depends upon its relation to a "Communist-action organization". The Party was alleged to be, and was finally found to be, a Communist-action organization[1]

The cases arise under the Subversive Activities Control Act of 1950.[2] The statutory definitions of the two types of organizations are reproduced in the footnote.[3] The provisions in respect to Com-

---

1. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

2. 64 Stat. 987, as amended, 50 U.S.C. § 781 et seq.

3. "Sec. 3. For the purposes of this title—

\* \* \* \* \*

"(3) The term 'Communist-action organization' means—

(a) any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign orgnization controlling the world Communist movement referred to in section

munist-front organizations followed from a finding of fact by the Congress, which is also reproduced in the margin.[4] The theory of the Board in this group of cases is that the organizations named were dominated, directed and controlled by the Communist Party of the United States and were operated primarily to advance its objectives. The theory is that these organizations were set up with highly respectable appearances and with highly respectable declarations of objectives, but that at least a substantial part of the real directors, operations and objectives were clandestinely those of the Communist Party.

After this petition for review had been filed in this court, a motion was made by the petitioner League seeking a dismissal of the petition and a vacation of the proposed order of the Board, upon the ground that the League has long since ceased to exist and that therefore the proceeding has become moot. Similar motions were made in six of the other cases in this group. The court remanded these cases to the Board for hearings and findings of the facts of the purported dissolutions. These hearings were held and findings made, and the Board rendered reports upon the remands.

This case is now before us upon the report on remand, as well as upon the original report requiring registration. The first problem before us arises upon the motion to vacate the order and dismiss the proceeding for mootness.

## I

We first look carefully at the statute. Its plan is as follows: It defines a Communist-front organization. It provides that the Attorney General shall keep a register of Communist-front organizations. Section 9(a). It provides that each Communist-front organization shall register with the Attorney General. Section 7(b). It establishes a Board (Subversive Activities Control Board) and provides that, whenever the Attorney General believes that an organization which has not registered should register, he may file with the Board a petition for an order requiring the organization to register. Section 13(a). The Board then holds hearings (Section 13(c)) and determines whether the organization is a Communist-front organization. If it determines affirmatively it makes a report in writing and issues an order requiring the organization to register. Section 13(g) (1). The organization may obtain judicial review of that order by filing a petition in this court. If this

---

2 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement as referred to in section 2 of this title; and

(b) any section, branch, fraction, or cell of any organization defined in subparagraph (a) of this paragraph which has not complied with the registration requirements of this title.

"(4) The term 'Communist-front organization' means any organization in the United States (other than a Communist-action organization as defined in paragraph (3) of this section) which (A) is substantially directed, dominated, or controlled by a Communist-action organization, and (B) is primarily operated for the purpose of giving aid and support to a Communist-action organization, a Communist foreign government, or the world Communist movement referred to in section 2 of this title."

4. "Sec. 2. As a result of evidence adduced before various committees of the Senate and House of Representatives, the Congress hereby finds that—

\* \* \* \* \*

"(7) In carrying on the activities referred to in paragraph (6), such Communist organizations in various countries are organized on a secret, conspiratorial basis and operate to a substantial extent through organizations commonly known as 'Communist fronts,' which in most instances are created and maintained, or used in such manner as to conceal the facts as to their true character and purposes and their membership. One result of this method of operation is that such affiliated organizations are able to obtain financial and other support from persons who would not extend such support if they knew the true purposes of, and the actual nature of the control and influence exerted upon, such 'Communist fronts.'"

court affirms the order or dismisses the petition for review, and no petition for certiorari is filed, the order of the Board becomes final upon the expiration of the time allowed for filing a petition for certiorari. Section 14(b) (2).

The registration statement of a Communist-front organization must show the name and address of the organization, the name and last-known address of each officer of the organization (including those who were officers any time during the twelve months preceding the filing), an accounting of moneys received and expended during the preceding twelve months, etc. Section 7(d).

The Act provides that, when an organization is registered or a final order requiring registration is in effect, it shall be unlawful for any member of the organization, with knowledge or notice of the order, (A), in seeking, accepting or holding employment under the United States, to fail to disclose the fact that he is a member of the organization; or (B) to hold any employment under the United States; or (C), in seeking, accepting or holding employment in any defense facility, to fail to disclose the fact that he is a member of the organization (Section 5(a)): and further it shall be unlawful for a member of such an organization to make application for a passport or to use a passport (Section 6(a)). The penalties for violation of the foregoing provisions are a fine of not more than $10,000 or imprisonment for not more than five years, or both. Section 15(c), last sentence.

Before leaving the terms of the statute we note these features: First, the registration statement of a Communist-front organization does not require a listing of the names of its members; it requires only the names of its officers. The statute nowhere requires a membership list. Second, the restrictions placed upon members arise when the organization is registered or an order requiring registration becomes final. If an appeal is taken to this court from an order of the Board requiring registration, the order does not become final until that appeal has been disposed of. The restrictive provisions of the statute (Sections 5 and 6) are not only phrased in the present tense but specifically say that "when" the organization is registered, etc., the sanctions attach. They attach to persons who are members when the organization is registered or the order requiring registration becomes final. Third, the sanctions, or restrictions, are that members of an organization required by a final order to register are prohibited from holding (not only seeking but holding) a Government job and from using a passport, and they are prohibited from holding a job in a defense plant unless they give notice that they belong to a Communist front. Fourth, these proscriptions are effective immediately the order of registration becomes final. No intervening steps are provided.

## II

The facts relevant and material to the the problem of mootness differ somewhat in the various cases. We shall discuss only those in the Labor Youth League case now before us. The League was an unincorporated association which came into existence in May, 1949. The dates of the following events are important to the consideration. In April, 1953, the Attorney General petitioned the Board for an order requiring registration. The organization answered over the signature of its attorney and attached an affidavit by its national administrative secretary. On February 15, 1955, the Board issued an order requiring the League to register. On April 14, 1955, the League petitioned this court for review. On February 23–24, 1957, the League held a national convention and resolved to dissolve. The attorneys for the League and its former acting chairman assert that since that date the League has had no national officers, no meetings, and no activities of any sort. The Board agrees and says that the record leads to the findings "that in addition to being inactive since the convention of February, 1957, there has been no national office of the League, as there had in the past, and there have been no

national officers." The Board also found, and says that counsel for the Attorney General agree, that "there was a dissolving convention and that the League has not been active since." The Board is of the view that the purported dissolution was not effective, and it also says that even assuming an effective dissolution the "possibility of reactivation of the organization" precludes a holding that this appeal has become moot or that the order of the Board has become moot and therefore incapable of finalization.

Thus the problem before us casts itself into these questions: (1) Did the League dissolve itself by all practical and legalistic means, and, if so, did it thereafter remain in the state thus effected? (2) Even if it did, does the possibility of reactivation and the absence of a guarantee of permanency of dissolution negate the dissolution? (3) Where an organization has been formally dissolved and has been totally without activity, assets or officers since the formal dissolution, should the court finalize an order of the Subversive Activities Control Board requiring the organization to register as a Communist front? (4) If not, what should a court do with such an order of registration proposed by the Board on a record depicting the organization as it was before it dissolved? We consider these questions seriatim.

### III

When the remand order was received by the Board, a hearing was ordered. A Mr. Durham, formerly acting chairman of the League, was presented by the League as a witness. He testified as to the dissolution. On cross-examination he identified two documents, and the Attorney General's representative offered them in evidence. They were not contradicted or impeached; indeed, they appear in the record as the Attorney General's exhibits. No testimony other than Mr. Durham's was presented, and no other exhibits were offered. The following account is derived from the two exhibits and the transcript of the hearing, i. e., Mr. Durham's testimony:

The National Office of the League issued early in 1957, over the signature of Durham as acting chairman, a "Call to the Third National Convention". It was addressed to "Dear Members". Its contents were three short paragraphs. It said in part, "Many months of debate on the future of the LYL as an organization should be continued at this Conventon, and conclusions determined." The call said that each state or city organization was entitled to two delegates plus one more for each ten members in good standing. One city and eight states sent delegations, a total of twenty-seven delegates. At the hearing Mr. Durham testified that all the states and regions in which there were League organizations were represented at the Convention. Opening remarks were made by Mr. Durham. He devoted his address to two themes, (1) the contributions he said had been made by the League to the American youth movement and (2) a somewhat bitter résumé of the reasons why "today our League has become isolated, numerically practically non-existent, with no prospect of growth." He said that many State organizations of the League had sent recommendations for dissolution of the League and that the National Staff agreed and would so recommend. Mr. Durham gave several reasons for the steady decline of the League, including such things as errors in the concepts it set for itself, concepts of how to teach Marxism and Socialism, "sectarian errors in many of its practical activities," errors in the presentation of Marxism, and errors in the relationship to the Communist Party—"we practically duplicated all the errors of the CP". The general discussion which followed reflected strong but differing views. Members expressed pride in the early accomplishments of the League and emphatic belief in the "basic principles of scientific socialism". Many different opinions were given as to the reasons for the then-present crisis of the League. Some said it was part of the critical situation faced by the entire "Left" movement. They repeated Durham's re-

cital of errors in concept and operation. Others said the League had become a "junior Communist Party" and did not "meet the needs of the American youth movement." "At least one delegate" said the decline in membership was due primarily to the relatively stable economic life enjoyed by American youth.

A motion for dissolution was presented. On the vote there were 20 ayes, 4 nays, and 3 abstentions. It was then resolved that the League was "hereby dissolved"; all state, city, county, and affiliated clubs "are also hereby dissolved"; the National Council, National Staff, and all executive officers and councils "are hereby dissolved and shall no longer exist"; and all national, state and local offices were ordered closed, all assets liquidated, all financial records turned over to a certified public accountant, and available copies of publications given to public libraries.

The financial statement showed cash on hand of $132.54 and unpaid debts of $624.00.

We have recited the foregoing in some detail, because it shows, conclusively we think, that at the Convention the officers and delegates were consciously dealing with a defunct organization. They bemoaned the condition; they were undaunted in their beliefs, but they were faced with the fact that the League had disintegrated. We think it is clear from the exhibits, and confirmed by the testimony, that the dissolution voted was not wanted but was dictated by the inescapable facts of the situation. The testimony was to the same effect. The Board found that since that date, February, 1957, the League has had no activity, no offices, no officers.

The Board says, however, that the purported dissolution was ineffective legally, because the members voting at the Convention were less than a majority of the League's membership. But the uncontradicted testimony at the hearing was that this was a convention of delegates and that all the state and regional councils were represented. Those now speaking for the League point out that to

assemble from distant points a large number of persons in order to formalize an already existing fact of disintegration is an impossibility. That is a commonsense view, and we think a factual showing is required to justify its rejection. The Board says the dissolution was not accomplished in accordance with the constitution of the League, in that the National Council did not meet prior to the Convention. The testimony of Mr. Durham was: "By the time, leading to the convention, the National Council had practically disintegrated because of lack of participation of its members. There was no council to meet." That evidence was not contradicted. It seems to us that, if an executive board, such as the Council seems to have been, actually and in fact disintegrated, its failure to meet cannot make impossible the dissolution of the organization.

The Government offered no evidence to contradict the evidence, introduced by the League, concerning the dissolution. The League claimed a dissolution and a five-year ensuing state of affairs confirming the dissolution action. Its burden was to show not only a formal act of dissolution but also that it did nothing thereafter inconsistent with the act of dissolving. It made a *prima facie* case. Its evidence was direct and emphatic. Mr. Durham testified: "The Labor Youth League is dissolved. No one has talked to me about the Labor Youth League. * * * No representatives of anybody has talked to me about the Labor Youth League since it was dissolved. * * * We closed the office." He said all the assets—desks, typewriter, etc.—were sold to a used-furniture dealer. He said: "We went out of business. We closed the offices. We fired all the officers. I no longer had a job, and there has been nothing from the Labor Youth League since that date." At that point the Government said that these conditions had not been shown to be permanent and that it had not been shown that a possibility of reactivation did not exist. In so far as those claims were factual,—that is, in so far as the Gov-

ernment meant that the League had not taken the steps it said it took, or had taken countermanding steps, or that the formalities were in fact a sham, or that the League or someone in its behalf had been active in the ensuing period of time, —the burden was on the Government to present evidence to support its claims. It offered none. The *prima facie* case was not rebutted.

We conclude on this first phase of our problem that the uncontradicted evidence established that the League was factually dissolved in 1957; that in the five years which have since elapsed it has had no activity, assets, offices or officers; and that it is presently non-existent. The Board's findings indicative of those conclusions (conceded generally, as already noted) should have been specific.

### IV

We come next to the question whether an inchoate possibility of reactivation, or, phrased otherwise, the absence of a guarantee of permanence, can negate a factual dissolution of an unincorporated group. We think it cannot. To hold affirmatively on that proposition would be to hold that such a group could never effectively dissolve. No one can ever assure an everlasting dissolution of an unincorporated group. A stoppage of existence can be accomplished; a group can have no present actuality and no present intention of reorganizing; it may be presently completely *non est;* but an eternity of disintegration can never be guaranteed in respect to a group. Reactivation may be at a far distant time and by other people. There is no necessary thread of life between a past unincorporated entity and a reactivated successor. People today purport to revive or reactivate orders, guilds, and the like which existed in the middle ages and have had no signs of life for five hundred years. We think it cannot be held that the indestructible possibility of reactivation makes impossible the legal dissolution of such a group.

The matter is vivid in the case before us. The finalization of the order under review would subject to drastic sanctions the members of the League, *instanter* and without intervening recourse. Who are the members? If the possibility of reactivation negates the dissolution sufficiently to make valid a presently issued order requiring it to register, it must negate the dissolution of the League sufficiently to make its members at the time of dissolution members now. It is plain from the record before us that these people got out of this League. Most of them just quit. The others met and resolved to that effect. Their desertion, for whatever cause, induced the rigor mortis which preceded and made mandatory the final ceremony of interment. Could they not effectively quit?[5] Did the possibility of reactivation of the organization, which is an indestructible possibility and which might be accomplished without them as members, prevent them from effectively leaving the organization? Obviously, if these people are members now because of the possibility of reactivation of the organization, they are members forever. We think this is not and cannot be the law. Nor do we think an unincorporated group can continue to live as a disembodied spirit— a ghost without flesh, blood or bones— after its members and organs have all been removed.

We are of opinion that a formal, factual, bona fide dissolution accomplishes the extinction of an organization despite the ever-present possibility of reactivation or the absence of a guarantee of permanence.[6]

5. In this connection we interject the comment that there is a real and omnipresent possibility of return to membership after resignation. But surely it could not be successfully contended that because of this possibility an individual remains a member of an organization after he has formally resigned and ceased all participation in the organizational activities. A formal dissolution is in effect a mass resignation.

6. This court used the word "permanent" in its order of remand, saying that the Board should determine the facts concerning the dissolution "and the perma-

## V

This brings us to the problem whether a registration order upon a presently non-existent organization should be finalized by this court upon the ground that the moribund state is not shown to be permanent and a possibility of reactivation exists. We think it should not, for two reasons. The first reason is that in finalizing such an order the court would be entering an order without identifiable substance and without either present or foreseeable effect upon the ostensible party to the proceeding; the court ought not engage in such a vague gesture. The second reason is the potential impact upon numbers of people without recourse.

If the court finalizes the order of the Board, the League would be required to register. The registration must be accompanied by a registration statement containing certain information. The statute provides that "In the case of failure on the part of any organization to register or to file any registration statement" the executive officer and the secretary shall register for the organization and file the statement. Section 7(h). Of course the "organization" would have to perform the act of registering through the medium of some human being, and to make his act authoritative for the organization he would have to be empowered by the organization so to act. Normally, and in the absence of special deputation, such a person would be an officer. But the Board has found that there have been no officers and no activity since 1957. There is no one to register or to authorize registration. The court knows now that its order would be vain. Upon the oral argument counsel for the Government agreed that this court might insert in any judgment finalizing the registration order provisions reciting that the organization now has no office, no officers, and no members. But we think it is not in accordance with the proper administration of justice, or indeed with the proper exercise of judicial power, for this court to enter such an order under such conditions. A court would not issue an injunction or a mandatory order against a named individual or an individual under the appellation "John Doe" if it knew from a formal finding of record that no such person exists.

The Board argues that the sole concern of the present proceeding is registration of the League. The Board has no function under the statute except to order registration; it has no part in further proceedings respecting sanctions. Thus, it says, registration *per se* is the first step in a chain of proceedings. But the registration should be of organizations and activities related to substance and to actuality. To serve any purpose it must be so. The naked entry of a name in a book serves no purpose discernible in this statute, unless the name identifies an existing entity. We do not perceive that the registers are designed either as history books or as fiction. The registration here involved requires a complicated procedure—preliminary hearings and findings—and is intended to serve a purpose of substance. It seems to us that the Board was created for the very purpose of preventing these registrations from being meaningless exercises.

The second reason leading us to conclude that the court should not now finalize this order is its impact if it be finalized. It is true that in this case the validity of the statutory sanctions as such is not an issue. We could not hold in this case that the sanctions could not or would not apply to certain persons. No such persons and no such issues are before us. But we do have before us an order of a Government agency, and we are asked to place upon it our stamp of approval. When we do so, certain effects are automatically applicable to people. We think that in contemplating our prop-

---

nency thereof". But the court obviously intended, however ineptly we expressed it, for the Board to ascertain whether the claimed dissolution continued uninterrupted until the present time; in other words, whether the dissolution was actually accomplished and continued so, or whether it was in effect a sham.

er course in the situation here present we cannot ignore those results.

The provisions of the statute relating to Communist fronts are notably different from those relating to Communist-action organizations. In the latter case the registration statement contains a list of the members (Section 7(d) (4), and the organization is required to maintain "accurate records" of the names and addresses of the members (Section 7(f) (2)). If a Communist-action organization does not register after there is in effect a final order of the Board, its members must register as members. Section 8(a). If the organization does register, members listed on a registration statement must receive a notification in writing that they are listed. Those so listed who deny membership may request removal of their names by the Attorney General; if such request is denied they may petition "for relief" to the Board. Section 7(g). The relief sought will be "to strike his name from the registration statement * * * upon which it appears." Section 13(b). He can have a hearing before the Board on his petition. Section 13(c). If after hearing the Board determines that an individual is a member of a Communist-action organization, it must make a report in writing and issue an order denying the relief sought. Section 13(j) (2). And the person can have judicial review of an adverse order of the Board. Section 14(a).

None of the foregoing provisions or provisions similar to them appears in the statute as applying to members, other than the officers, of Communist fronts. Under the statutory scheme there is no listing of members or of alleged members of these front organizations. The organization is not required to supply or to keep lists of its members. Members are not required to register or be registered. They receive no notices of proceedings looking toward registration. Their first notice comes when the finalized order appears in the *Federal Register*. The statute provides no means by which people can obtain a determination as to whether they are or are not mem-

bers. When the order requiring registration is published, the sanctions apply to all the members without further ado.

In so far as these people are members of the Communist Party, the statutory provisions relating to Communist fronts have no appreciable effect. The Communist Party has been ordered to register. The statutory sanctions already apply to its members. When it registers it will supply lists of its members. Any alleged member has ample processes available by which he can get off the list. So we have no present concern over the effects of this order upon members of the League who are also members of the Party.

But under the basic concept of a Communist front, as contained in the statute, people render support to the organization who, in the words of the statute, "would not extend such support if they knew the true purposes of, and the actual nature of the control and influence exerted upon, such 'Communist fronts.'" Part of the statutory concept of a Communist front is that it conceals the facts as to its true character and purpose. Obviously numbers of the people who thus render support become members. Surely Congress did not purpose to punish these people for being gullible, and it hardly seems that the public interest requires that they be prohibited Government or defense employment or world travel. It could be argued, we suppose, that people so easily hoodwinked should not be afforded easy opportunity to do harm, but that view could hardly impel Congressional proscription.

What would be the effect of a final order of registration upon these people? The existence of a final order—finalized by this court—would appear to establish the present existence of the organization and its Communist-front nature. The appearance of actuality thus created would be a reasonable inference. Courts do not usually issue orders upon nonexistent premises. Persons who once were members would live under heavy clouds of threats from which no relief would be available. Meaningless in many

ways though the formal listing of a non-existent organization on the register would be, the people who had in years past been members—without, let us remember, realization of the Communist nature of what was once an entity—would be enveloped in a cloud, faced with the possibility of drastic events if some Government official, or some unneighborly neighbor, or some uncordial fellow employee should choose to accuse them of holding illegally a Government or defense-plant job. The Board says that if sanctions under this statute are sought against a person, alleging him to be a member of a Communist front, he can defend in any criminal action brought against him; he can show he is not a member. But the application of the sanctions does not always depend upon criminal prosecution. A discharge from a job, a refusal of a passport, or a refusal of a job applied for do not involve a criminal proceeding. If there were on the books an order requiring an organization to register, it is not unlikely that somebody, either public official or private citizen, at some time in the future, under some circumstances, might bring an accusation, asserting the presumed validity and substantiality of the order on the books. Such an accusation could be given effect in the respects we have mentioned, without the necessity of a preliminary court, or any other formal, proceeding.

It seems to us that a point of simple justice is involved here. It seems to us that, under the combination of all the circumstances and considerations here present, an order of these potentialities ought not be entered by a court without the presence of someone who, at least theoretically, could speak for the people most likely to be damaged. No such person exists here. The minimum requirement of justice seems to us to be an existing party respondent.

## VI

The Board seems to regard as blameworthy the voluntary dissolution of the League when the Attorney General asserted it was a Communist front. Quite to the contrary, it seems to us that, if the group dissolves, the purposes of the Act, and more, are accomplished. If the organization dissolves and ceases all activity, there is nothing about which the public needs to be informed or from which it needs to be protected; the real Communists are already under the sanctions imposed upon the Party; and there is no organization from which unsuspecting members need withdraw. That elimination of a Communist front be accomplished by a threat of an order of registration does not detract from the efficacy of the action. Long and cumbersome proceedings are not essential requisites to achievement in the public interest.

We conclude on the point that for the two reasons we have described the order of the Board should not now be finalized by the court.

## VII

This brings us to the final question: What should be done? Failure to finalize the order does not mean it must be vacated or set aside. If we vacate the order or set it aside, the whole long record of these proceedings would be wiped out. In such event, if there were a reactivation of the League, the thousands of pages of testimony and hundreds of exhibits would have to be retaken if the prior history and now-present status of the League were material. The Board argues that if, when an order requiring registration has been entered by the Board, an unincorporated organization could render the order moot by simply dissolving and becoming inactive, the members of the organization could dissolve it whenever an order of registration is threatened, and thereafter reactivate, and could by this simple maneuver permanently prevent such an order from ever becoming final. This is true and is an argument of some weight.[7] But there is open a middle course which seems to avoid many difficulties while ac-

---

7. We comment, however, that the subsidiary argument pressed by the Board

in this connection is not impressive; the Board says that such a state of affairs

complishing all major objectives. Courts have often dealt with problems of alleged mootness of pending controversies. There is the familiar line of cases in which the Supreme Court has ordered that, the case having become moot while upon appeal, the trial court or administrative agency should vacate its judgment and dismiss the cause. These cases are summarized and the reasons for such action explained in United States v. Munsingwear.[8] Then there are the cases in which, mootness having been shown, the Court took other action, such as directing that injunction orders remain in effect. Some of these cases are discussed in Mills v. Green[9] and in Walling v. James V. Reuter, Inc.[10] The conclusions which seem clear from an examination of the cases are that mootness is not a fixed term of uniform factual content but is a variable from the factual standpoint, that it arises from different causes, and that the action required by justice varies from case to case depending upon the circumstances. The Supreme Court epitomized the rule in this language in the Walling case: "If a judgment has become moot, this Court

may not consider its merits, but may make such disposition of the whole case as justice may require."[11] To the same effect is the statement in Heitmuller v. Stokes.[12] We shall apply this latter doctrine to the present case.

We think the proceeding should be remanded to the Board with instructions to place it in an indefinitely inactive status. If there be a reactivation of the League, the Board may reopen the record, take such additional testimony as may be required by the new circumstances, and reissue its order upon the then-active and live organization in the light of the then-established facts. We need not repeat the reasons for this conclusion. All the considerations recited in this opinion point to it. We will so order.

In view of our disposition of the case it is unnecessary that we consider whether, if the League were in existence, it would be a Communist-front organization or whether under those circumstances the statute would be constitutional if applied to it and its members.

Remanded with instructions.

would compel it to hold repeated hearings. But it seems to us that repeated hearings are inherent in the circumstances of dormancy followed by reactivation. If a presently non-existent organization were reactivated, justice would require some examination into the new facts—the new operations, new officers, new purposes, new membership—before the order, even if already finalized, was put into active effect. So we think the argument premised upon the necessity for further hearings in the event of reactivation, if the order be not now finalized, has no substance.

8. 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

9. 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293 (1895).

10. 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001 (1944).

11. Id. at 677, 64 S.Ct. at 829.

12. 256 U.S. 359, 362, 41 S.Ct. 522, 65 L. Ed. 990 (1921). And also see United States v. Hamburg-Amerikanische Co., 239 U.S. 466, 476–478, 36 S.Ct. 212, 60 L.Ed. 387 (1916); Defense Supplies Corp. v. Lawrence Warehouse Co., 336 U.S. 631, 69 S.Ct. 762, 93 L.Ed. 931 (1949); and the several opinions in Parker v. Ellis, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960).