**VETERANS OF the ABRAHAM LINCOLN BRIGADE, Petitioner,**

v.

**SUBVERSIVE ACTIVITIES CONTROL BOARD, Respondent.**

**No. 13174.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 3, 1962.

Decided Dec. 17, 1963.

Petition for Reconsideration Denied Feb. 17, 1964.

Certiorari Denied June 22, 1964. See 84 S.Ct. 1916.

‍

Mr. Leonard B. Boudin, Washington, D. C., with whom Mr. David Rein, Washington, D. C., was on the brief, for petitioner.

Mr. Robert L. Keuch, Atty., Dept. of Justice, with whom Mr. Frank R. Hunter, Jr., Gen. Counsel, Subversive Activities Control Bd., Messrs. Kevin T. Maroney and George B. Searls and Mrs. Lee B. Anderson, Attys., Dept. of Justice, and Messrs. Charles F. Dirlam and Peter P. Hanagan, Attys., Subversive Activities Control Bd., were on the brief, for respondent.

Mr. Edward J. Ennis, New York City, filed a brief on behalf of American Civil Liberties Union, as *amicus curiae*.

Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and DANAHER, Circuit Judge.

PRETTYMAN, Senior Circuit Judge:

This case is another in the series of Communist-front cases which had been pending before the court awaiting the outcome of the *Communist Party* case.[1] The statute[2] and its application were discussed in No. 12642, Labor Youth League v. Subversive Activities Control Board, decided April 25, 1963,[3] and in No. 13260, National Council of American-Soviet Friendship v. Subversive Activities Control Board, decided May 16, 1963.[4]

The petitioner organization[5] is composed of former members of a fighting force called the Abraham Lincoln Brigade, a unit of approximately three thousand men who went in groups from this country to Spain during the late 1930's to fight on the side of the Republican Army, sometimes called the Loyalists, in that country's Civil War. That war took on an international image as a struggle between Fascism and Communism. The outcome is a matter of history. The Subversive Activities Control Board found that the Lincoln Brigade was one of several international brigades, from various countries, organized by the Communist Party pursuant to directive from the Communist International in Moscow, to advance the Soviet cause in Spain. According to the Board, of the three thousand men who went from this country, eighteen hundred returned and less than six hundred survived at the time of the Board's report. The Board found that many, but not all, of the returning veterans were organized into the petitioner organization, under the direction and control of the Party, and that it has been, and was at the time of the report, a Communist-front organization, being dominated by the Communist Party and

rendering substantial aid and support to it.

The organization itself, petitioner herein, admits in its brief that it was organized around the time of the return of the American participants in the Spanish Civil War. It claims that its functions included "the fostering and continuation of the friendships and fellowships formed in Spain and the rehabilitation and resettlement of the veterans who had returned from Spain." It further states:

"Many of the men who returned were in need of medical care, in some cases of an extended nature involving operations and hospitalization. The petitioner provided this care to its members without charge. All of the returning veterans were given clothes and some money to tide them over until they could obtain employment. The petitioner assisted veterans in obtaining employment, places to live and in the solution of other problems posed by the adjustment to civilian life. The petitioner also engaged in political activity with its main emphasis on the continuation of opposition to the Franco regime in Spain."

Petitioner also claims that activity in recent years has been meager and spasmodic, consisting of social affairs, rehabilitation functions, "occasional statements in opposition to the Franco regime and some activity in support of its members who were indicted under the Smith Act".

The Board hearing was held in late 1954, and its report was issued December 21, 1955. After the Supreme Court had disposed of the *Communist Party* case, *supra*, oral argument was had in this court in October of last year (1962).

---

1. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

2. Tit. I, Internal Security Act of 1950, 64 STAT. 987, 989, as amended, 50 U.S.C. § 782(4).

3. 116 U.S.App.D.C. 151, 322 F.2d 364.

4. 116 U.S.App.D.C. 162, 322 F.2d 375.

5. Sometimes referred to in this litigation as VALB or the Brigade.

## I

The ultimate conclusion of the Board which we are asked to set aside is that this organization is a Communist front and therefore must register with the Attorney General.

█ Section 3 of the statute defines a Communist-front organization as:

"[A]ny organization i- the United States * * * which (A) is substantially directed, dominated, or controlled by a Communist-action organization, *and* (B) is primarily operated for the purpose of giving aid and support to a Communist-action organization, a Communist foreign government, or the world Communist movement ⁂ * *." (Emphasis added.)

Thus the statutory definition has two parts, one relating to the direction or control of the subject organization and the other relating to its purposes. A Communist front is directed, dominated or controlled by a Communist-action organization (in this case the Communist Party), and its primary purpose is to aid and support the Party. This is the statutory definition, and so this was what the Attorney General undertook to establish before the Board.

█ In another section of the statute (Sec. 13(f)) the Congress directed the Board as to what it must—"shall"—take into consideration in determining whether an organization is a Communist front. It listed four such subjects, which have come to be called "criteria" in these cases. The intended relationship between the statutory definition and these criteria is not altogether clear. But it is clear that to declare an organization a Communist front the Board must find it to meet the statutory definition. And further it is clear that in the process of reaching that conclusion the Board must "take into consideration the extent to which" the organization has four specified features.

The four statutory criteria are:

"(1) the extent to which persons who are active in its management, direction, or supervision, whether or not holding office therein, are active in the management, direction, or supervision of, or as representatives of, any Communist-action organization, Communist foreign government, or the world Communist movement * * *; and

"(2) the extent to which its support, financial or otherwise, is derived from any Communist-action organization, Communist foreign government, or the world Communist movement * * *; and

"(3) the extent to which its funds, resources, or personnel are used to further or promote the objectives of any Communist-action organization, Communist foreign government, or the world Communist movement * * *; and

"(4) the extent to which the positions taken or advanced by it from time to time on matters of policy do not deviate from those of any Communist-action organization, Communist foreign government, or the world Communist movement * *."

The Board found on the record before it the presence of specific and detailed evidence as to each of these criteria and concluded, on the "overwhelming weight of the evidence", that the Brigade is "directed, dominated, and controlled by the Communist Party of the United States—a Communist-action organization—and * * * is primarily operated for the purpose of giving aid and support to it and the world Communist movement."

## II

██ Before entering upon a review of the Board's findings in this case, we interject here, as we did in the *National Council of American-Soviet Friendship* case, *supra,* a comment upon the importance of the time element in the statutory terms involved. This statute is cast in the present tense. It is not designed to produce historical treatises. It is designed to compel the public registration of organizations which, subsequent to the passage of the Act, operate to aid the

aims of the Communist movement. This time element is not a technicality, or a happenstance, or a matter of semantics. It is a basic concept. The 1930's, '40's and '50's, *i. e.*, the years before, during and after World War II, witnessed three different policy periods in the relationships between the Soviet Union and the United States. We were for a while neutral in the conflicts in Europe; then we were allies with the Communists against the Nazis; and then, in the presence of rapidly developing historical events, the Congress in 1950 declared the Communist movement to be a revolutionary movement designed to establish a Communist totalitarian dictatorship in all countries in the world. The Congress found and declared in that Act that the foreign Communist dictatorship establishes and utilizes in other countries action organizations which are sections of the Communist movement and are controlled and directed by the foreign dictatorship.[6] And it further declared in that same Act that "those individuals who knowingly and willfully participate in the world Communist movement * * * in effect repudiate their allegiance to the United States".[7] To expose to public knowledge these organizations and these individuals was the prime purpose of this statute.

■ Thus it is that in determining whether a certain organization should be required to register the Board must determine its nature in the 1950's or thereafter. Its prior history may of course be valuable evidential material, but the finding must be as of the time of hearing or reasonably close to it—at the earliest as of the time of the passage of the Act or subsequent thereto.

### III

■ Again preliminarily, we note one more feature of the statute. We noted it in the *National Council* case, *supra*. We note it again. A Communist-front organization must be, as the Government points out in the cases we have thus far considered, directed, dominated and controlled *"by the Communist Party,"* not by mere members of that entity. That this specification is material is demonstrated by a comparison between the definitions of a Communist-front organization and a Communist-infiltrated organization. We have recited the former, *supra*. As to the latter the statute states:

"The term 'Communist-infiltrated organization' means any organization in the United States * * * which (A) is substantially directed, dominated, or controlled by an individual or individuals who are, or who within three years have been actively engaged in, giving aid or support to a Communist-action organization, a Communist foreign government, or the world Communist movement * * *."[8]

In short, a Communist-front organization is controlled by the Communist Party; a Communist-infiltrated organization is controlled *not* by the Party but by an individual or individuals who render "aid or support" to the Party.

This conclusion is high-lighted by a reading of the first or "control" criterion of consideration specified by the statute as to each of these organizations. As we have noted, in the Communist-front proceedings the Board must consider:

"(1) the extent to which persons who are active in its [*i. e.*, the organization involved] management, direction, or supervision, * * * are active in the management, direction, or supervision of, or as representatives of, any Communist-action organization [in this case the Party] * * *."

On the other hand, with reference to Communist-infiltrated organizations, the Board must consider:

"(1) to what extent, if any, the effective management of the affairs of such organization is conducted by

---

6. 50 U.S.C. § 781(5).

7. Id. § 781(9).

8. Sec. 7(a), Communist Control Act of 1954, 68 STAT. 777, 50 U.S.C. § 782(4A).

one or more individuals who are, or within three years have been, (A) members, agents, or representatives of *any* Communist *organization,* \* \* \* or (B) engaged in giving aid or support to any such organization \* \* \*." (Emphasis supplied.) [9]

We will not construe the meaning of the Communist-infiltrated criterion until there is a case which calls on us to do so. We point to the language of that criterion as an aid in the construction of the meaning of the criterion used in connection with Communist fronts.[10]

A front must be controlled by the Party. This is the first requirement of the statutory definition; *i. e.,* (A) of the defining sentence. How does the Party act? The answer, it seems to us, is found in the first of the criteria specified for Board consideration. That is to say, the Party acts through persons who are "active in [its] management, direction, or supervision, or \* \* \* as [its] representatives". Obviously a representative is one authorized.

So the inquiries in this case upon the first half of the statutory definition are (1) whether persons active in the management, direction or supervision of the Brigade in 1950 or thereafter were authorized to do so by the Party; and (2) whether these persons were the dominant or key voices in the management of the Brigade.

### IV

The evidence and the findings in this record [11] contain voluminous data concerning the organization of the Brigade and its participation in the Spanish Civil War, which began in July, 1936, and continued until March, 1939. It is clear that the struggle between the Republican government and the rebel forces was basically between Fascism (led by Franco and the Spanish Fascist Party) and Communism (supporting the Republican government). The Brigade tells us in its brief that the only substantial military supplies received by the Republican government came from the Soviet Union and, to a much less extent, from Mexico. It tells us further that the Communist Party, among others, rallied its members to join the Republican Army; that volunteers throughout the world joined that Army; that the American volunteers became known as the Abraham Lincoln Brigade; and that Communists in the United States played a large part in recruiting the members. There is a dispute as to the control and supervision of these Brigades while in Spain, whether it was by the Comintern or independently by the Spanish government. And there is a dispute as to the number of "Communists" in the Brigade and the number who were killed and how many returned. The Brigade says twelve hundred of the American volunteers returned; the Board says eighteen hundred.

All the foregoing is interesting. It is also important, but only in so far as background material may shed light on later events. It is clear that from among the surviving returnees came the present members of the Brigade. The Brigade was organized in 1939, and in 1940 it was incorporated in New York as a membership corporation. In addition to the national organization it had local posts in some cities. Two Government witnesses testified that they were present at meetings, one of the Politburo and the other of a Central Committee of the Party, when directives were issued to organize, direct and control the Brigade and reports on its progress were made. One of these witnesses testified, based

---

9. 50 U.S.C. § 792a(e) (1).

10. We note that, whereas the Communist-front criterion is cast in the present tense, that is, "are active", the Communist-infiltrated provision appears in the alternative, that is, "are, or within three years have been". Moreover in the case of a Communist-infiltrated organization the representative need not be of an action organization but may be of any Communist organization, *i. e.,* not only an action organization but of a front or another infiltrated organization.

11. The record contains 4576 pages of testimony, 306 exhibits, and 123 single-spaced, mimeographed pages of Report.

upon official reports made in his presence at meetings of the Politburo and National Committee of the Party, that the principal objective and major purpose of the Brigade were as an integral part of the Party apparatus. Milton Wolff, the last battalion commander of the group in Spain, was elected National Commander of the Brigade at its first national convention, and he has held that post until the present time. Because of failure to file required reports, the corporate charter under New York law was forfeited October 15, 1962. The Brigade says its national executive board has not met or functioned in any way since 1949. That position is contradicted in some degree by a letter mailed to Brigade members under date of April 25, 1952, signed "Fraternally yours, for the National Committee of the Veterans of the Abraham Lincoln Brigade," followed by the signatures of Wolff, Fishman, and nine others.

The Board made a finding that "Respondent has operated for the past five years into the present through two principal active officers, Moe Fishman, Executive Secretary, and Milton Wolff, National Commander." It also found that "In 1952, respondent's nine-member Executive Committee included six Party members, namely, Irving Weissman, Steve Nelson, Harold Smith, Vaughn Love, Daniel Groden, and Alvah Bessie."

We have diligently searched the record references given us. Almost startling is the fact that so little of the evidence relates to 1950 or years thereafter. Of the thirteen Government witnesses who had been members of the Party, either bona fide or as undercover agents, all but three left the Party before 1950.[12] Of these three Blauvelt was expelled in November, 1951, but her testimony related to Steve Nelson in 1946. Matusow has already been discredited as a witness

in these cases.[13] Lautner left the Party in 1950. All of these thirteen witnesses testified to events occurring while they were Party members. The evidence as to post-1950 is principally documentary.

The Board repeatedly refers to the officers (Wolff and Fishman) and to the six members of the Executive Committee (whom we have mentioned) as "functionaries" of the Party. In the *National Council* case, *supra*, we quoted the Government witness Clontz's definition of that term. On the present record the witness Lautner defined it. He said that "a Party functionary is a member of the Communist Party who has a specific assignment from the Party. * * is a dedicated person who subjugates his own personal desires and problems, to that of the discipline of the Party. * * will go wherever the Party sends him and do whatever the Party demands of him, and completely subjugates himself to Party discipline." The evidence does not show, so far as we can find, that Wolff or Fishman were functionaries within that definition, or that they held any official positions in the Party, or that they were picked by the Party. They were members of the Party, and a witness (Budenz) testified that Wolff made reports concerning the Brigade to the Politburo prior to 1945. Of the six above-named Executive Committee members, Weissman was a Party organizer in West Virginia in 1949. Nelson was variously identified as having been a section organizer for the Party, a member of the National Committee, and as having an office at Party headquarters. Harold Smith had been Earl Browder's bodyguard and secretary and remained loyal to him when he was expelled from the Party. One witness said Vaughn Love was a political commissar in Spain in 1938 and had instructed him to join the Communist Party of Spain. A witness said that Groden

12. Blauvelt in 1951, Budenz in 1945, Gladnick in 1939, Harris in 1948, Hecht in 1939, Herrick in 1939, Horan in 1939, Horvath in 1947, Huber in 1947, Lautner in 1950, Maken in 1939, Matusow in 1951, and Romerstein in 1949.

13. See Communist Party of United States v. Subversive Act. Con. Bd., 102 U.S. App.D.C. 395, 399, 254 F.2d 314, 318 (1958).

had been instrumental in bringing about the expulsion of two friends of his (the witness's) from the Party. The same witness said, "Danny Groden I believe was an organizer." Bessie was an editor on the *New Masses*, and the Party secured for him a position as a writer in Hollywood. Bessie joined in an attack by the Party on Hemingway's book, *For Whom The Bell Tolls*.

We think the reasonable inferences from the evidence are such that it can properly be concluded that a preponderance of that evidence establishes these eight men to have been members of the Party. But, as we have said, we find no direct, specific evidence that Wolff and Fishman, the two found by the Board to have been the "two principal active officers" of the Brigade during the five years prior to the Board's hearing, were in those positions as representatives of the Party. As we have said, we find no evidence that they were selected by the Party. Wolff was elected at a Brigade Convention, and he testified that he personally picked Fishman. The representative capacity, if any, of these two must be inferred from the fact that they made reports to the Politburo concerning the Brigade.

We think it is reasonable to conclude from the evidence we have very briefly summarized that Nelson, Weissman, Smith and Love were Party "functionaries". There is evidence that Nelson was designated by the Politburo as "liaison" man with the Brigade. But the part of these men in the management or control of the Brigade must be inferred from the fact that they were members of the National Committee. The duties of that Committee are not shown by direct evidence. But absent contrary evidence it is reasonable to assume that a small "National Committee" had duties relating to management.

## V

In this posture of our consideration we turn to the three other criteria. Because it seems to us that, although the language of the first two criteria (one directly and the other indirectly) relate to management and control and the other two relate to objectives and policies, it was not intended that the four criteria be split into two separate parts, one applicable to the first half (clause (A)) of the statutory definition and the other applicable to the second half (clause (B)). The statute itself does not indicate such a dichotomy of the criteria. We think the Board must "take into consideration" all four of these specifications in determining the applicability of the whole of the statutory definition.

By these other three criteria (Sec. 13(f) of the Act) the Board is directed to consider the extent to which (1) the support of the Brigade is derived from the Party, (2) its funds, resources or personnel are used to further the objectives of the Party, and (3) the positions taken by it on policies do not deviate from those of the Party. The record is replete with evidence of a close relationship between the Party and the Brigade, the activities of Brigade members in Party affairs, support of each of these organizations by the other, promotions of Brigade members within the Party, support of the Party by the publication of the Brigade, *Volunteer for Liberty*, and like support of the Brigade by the Party newspaper, *The Daily Worker*, and the similarity of positions taken by the two organizations on many matters of policy—all in the years up to 1950. But the acute question, as we have indicated, concerns the years immediately prior to the Board hearing (1954), specifically since the passage of the Act (September, 1950). The Brigade says in its brief to us that since the latter date its activities have consisted of social affairs, statements in opposition to the Franco regime, the rehabilitation of Brigade members in need of aid, support of its members indicted under the Smith Act, particularly Nelson and Weissman, and defense of itself in the present proceeding. The report of the Board does not materially contradict this factual position. It finds, and supports with numerous record references, besides a few unimportant in-

cidents,[14] vigorous and vehement opposition to Fascism and particularly to Franco, outspoken opposition to the Internal Security Act and all similar legislation, vigorous support of its indicted members, particularly Nelson, and efforts to defend itself.

Copies of *Volunteer for Liberty*, the publication of the Brigade, in the record as exhibits, include thirteen issues from September 7, 1951 (Volume 12, No. 8) to June, 1954 (Volume 15, No. 4). These are mimeographed sheets, running from one to six pages per issue, very informal and quite vigorous. They constitute original and documentary indications of the activities of the Brigade. They were written at the time by officers of the Brigade, addressed to the members of the Brigade concerning the activities and interests of the Brigade.

The principal interest reflected by these documents is, as the Brigade says, the defense of Steve Nelson, and to a less extent of Irving Weissman. Numerous appeals for funds for these purposes were made. The prosecutors, jurors and judges were vigorously assailed. Frame-ups were charged. Next in importance appears the Brigade's antagonism to Franco. The Truman administration was charged with all sorts of misdoing in its relations with Franco. Continuous attacks on the Internal Security Act, Senator McCarran, the Un-American Activities Committee, the Wall Street imperialists, and all war-mongers appear in these issues. The publication demanded cessation of the Korean War. These were clearly the principal aims of the Brigade in the post-1950 years as reflected by its official communications to its members.

All the activities just listed were aims and purposes of the Communist Party. Steve Nelson was indicted under the Smith Act as a member of the Communist Party. The allegations were that he was a member of the Party and that the Party taught the overthrow of the Government by force. These indictments were of vital importance to the Party. The Pennsylvania indictment was based upon the same allegations. It became a cause celebre.[15] The bitter antagonism between the Communist movement and Franco is history. Spain is a mother country to most of Latin America. The military bases sought by the United States in Spain were designed as part of protective measures against Communist aggression. The Internal Security Act was aimed at the Communist movement and its agencies. The Korean War was an action by the United Nations to contain Communist advances.

It is true, as the Brigade argues, that these positions on these subjects were also held by many people who were not even remotely allied with the Communist Party. So the question is: When a person, or an organization, actively presses objectives which are objectives of the Communist Party, does he or it do so as a matter of independent conviction, or does he do so by reason of substantial direction or control by the Communist Party and for the purpose of giving aid and support to the Party? This is a question of fact, the answer to which is to be derived from the record.

■ We think the Board was entitled to view these events in the context of, or through the coloration of, the past. The events in 1950–1954 were not factually isolated. The Brigade continued to operate after 1950. It had the same officers and occupied the same offices. It continued to publish its magazine. The character and tone of its declarations upon the subjects with which it dealt were the same as those it had always utilized. So that factually, on this record, the post-1950 activities and policies

14. Such as a birthday meeting in Los Angeles, a tribute to Stalin, a protest against a visit by a Falangist Dance Group and by the Mayor of Madrid, and the publication of a book on the Spanish Civil War.

15. Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L. Ed. 640 (1956).

appear as a continued, although diminished, stream, rather than as a separate, new phase of life. Thus viewed, in the light of all that had gone before, considering the extent to which the management of the Brigade was dominated by representatives of the Party, and the extent to which it supported the Party and the Party supported it, and its policies conformed to the policies of the Party, we think the Board was justified in concluding that upon the record as a whole a preponderance of the evidence establishes that the Brigade was, in the years immediately prior to the hearing, substantially dominated, directed or controlled by representatives of the Party, and operated primarily to aid and support the Party. A re-reading of our discussion of the evidence will demonstrate the point. We need not repeat that discussion. We add that the language and tone of *Volunteer for Liberty* support that view.

The Brigade says its primary purposes were the perpetuation of battlefield-born comradery and the assistance of veterans in need. If so, *Volunteer for Liberty* does not reflect it for 1950–54. That paper does carry announcements of mass meetings, a "soiree", and "encampment", a New Year's Eve Ball, and other similar events, but in almost all instances these gatherings were for other purposes, principally for the defense of Steve Nelson and in opposition to Franco and this proceeding. Admission was charged and collections taken up. Impassioned pleas for causes were made.

We are conscious of the fact that this case is important both to the public and to the individuals who are involved. We are also conscious of the tremendous volume of the record of this evidence, the almost numberless facets of fact involved, and the dozens of record references given us. All the findings are under vigorous attack. For these reasons we take an unusual step and invite a petition for reconsideration. If either party,

or both parties, feels or feel that we have overlooked evidence relating to post-1950 events or activities, it or they may file, on or before thirty days from the date of our order, a petition referring specifically to such evidence and giving its record references.

## VI

■ The Brigade argues that, although the Supreme Court held Section 7 of the Act (the registration requirement) to be constitutional [16] when applied to a Communist-action organization, the reasons given are not applicable to a Communist-front organization; and that as to the latter Section 7 is invalid. The argument is that the conclusion of the Court was premised upon the congressional findings concerning the world Communist movement, its purposes, and its methods of operation (Secs. 3(3) and 2(4)); and that there is nothing in this record to support a finding that the Brigade was foreign-controlled and operated or was utilized to bring about the overthrow of the government or the establishment here of a totalitarian dictatorship. But we think the Supreme Court's opinion is not so narrowly based. The purposes of the Act, said the Court, are expressed in Section 2 and the registration section is not "lacking in consonance" with those provisions. Section 2 of the Act, in subparagraph (7), recites that Communist organizations "operate to a substantial extent through organizations commonly known as 'Communist fronts'". So, as a matter of statutory constitutionality, we are of opinion that the conclusions reached by the Court in the cited case apply here. The discussion of the subject by the Court is too long to repeat. A reading of the whole of it will demonstrate its applicability to Communist fronts.

For the purpose of making effective our permission for the filing of a petition for reconsideration, issuance of the

---

16. Communist Party of the United States v. Subversive Activities Control Board,

367 U.S. 1, et seq., 81 S.Ct. 1357, 6 L.Ed. 2d 625.

mandate of this court will be withheld for thirty days. With this proviso the order of the Board is

Affirmed.

BAZELON, Chief Judge (dissenting):

In American Committee for Protection of Foreign Born v. Subversive Activities Control Board, 117 U.S.App.D.C. ——, 331 F.2d 53 (1963), decided today, I have explained why I think the statutory definition of a Communist front should be read to include only organizations "primarily operated for the purpose of giving aid and support to a Communist-action organization" in advancing the sinister objectives of the world Communist movement. Here, as in that case, the Board does not appear to have applied this standard. I do not consider whether the evidence would support a finding of sinister purpose, because in my view the staleness of the record requires us to remand the case to the Board for supplementary findings.

In Labor Youth League v. Subversive Activities Control Board, 116 U.S.App. D.C. 151, 322 F.2d 364 (1963), we noted that the serious consequences of registration to an organization and its past and present members demand strict adherence to the requirement that proof of its status be timely. There the problem was mootness. Here it is the age of the evidence at the time of the Board's hearings, and the lapse of eight years since the Board made its findings.

The hearings were held in 1954 and much of the evidence dated back to the late 1930's and the early 1940's. As the court points out, our relations with the Soviet Union have shifted radically in the meantime. And the Republican cause in the Spanish Civil War engaged the loyalties of sincere democrats as well as Communists.

Despite the court's warning against reliance on old evidence, it concludes that the Board could view the rather meager evidence relating to the period 1950–1954

"through the coloration of the past." I cannot agree.

As an example of what this court now approves, I refer to the Board's finding that officers or functionaries of the Communist Party controlled the Brigade in 1952. The Board included in this category the Brigade's two officers, Wolff and Fishman, and six of the nine members of its Executive Committee. The court recognizes that the preponderance of the evidence fails to show that either of the two Brigade officers, as well as two of the six Executive Committee members, were officers or functionaries of the Party at any time. This leaves only Nelson, Weissman, Smith and Love. But as to these four of the eleven top officials of the Brigade in 1952, the court ignores the age of the evidence that they were Party functionaries. The most recent evidence on any of the four concerns Weissman, said to be a Party organizer in 1949, and Nelson, on whom the evidence dates from 1946. The finding on Love is based on testimony given by Horan, who left the Party in 1939, concerning Love's activities in Spain in 1938. The evidence about Harold Smith goes back to 1946, when Earl Browder was expelled from the Party and Smith, his bodyguard, remained loyal to him. Continued loyalty to a man who had been expelled in 1946 does not support an inference that Smith was a Party functionary in 1952.

The record was stale when the Board made its findings. In the eight years since then there have been turbulent changes in world affairs. Though American-Soviet relations have not changed as radically in this period as before, the views of many who were formerly sympathetic to the Communist cause have undergone profound change, particularly after the brutal suppression of the Hungarian revolt in 1956.

I would remand to the Board for further hearings concerning the activities of the Brigade from the passage of the Act in 1950 to the present.