GASTELUM-QUINONES *v.* KENNEDY,
ATTORNEY GENERAL.

Nos. 39 and 293.   Argued March 19, 1963.—
Decided June 17, 1963.

*David Rein* argued the cause for petitioner.   With him on the briefs was *Joseph Forer*.

*Bruce J. Terris* argued the cause for respondent: With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *Julia P. Cooper.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

This case, stripped of its procedural complexities, raises the question whether an alien long resident in this country is deportable because, for a period during 1949 and 1950, he paid dues to and attended several meetings of a club of the Communist Party in Los Angeles. The Immigration and Naturalization Service sought and obtained an order for petitioner's deportation on the ground that these facts established petitioner's membership in the Communist Party of the United States within the meaning of § 241 (a)(6)(C) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 204–205, 8 U. S. C. § 1251 (a)(6)(C).[1] Whether membership was so established turns on the application of two decisions of this Court which construed the immediate predecessor of § 241 (a)(6)(C), § 22 of the Internal Security Act of 1950, 64 Stat. 987, 1006, 1008. In *Galvan* v. *Press,* 347 U. S. 522, 528, it was held that deportability on the ground of Communist Party membership turns on whether the alien was "aware that he was joining an organization known as the Communist Party which operates as a distinct and active political organization . . . ," and

---

[1] "(a) Any alien in the United States . . . shall, upon the order of the Attorney General, be deported who—

"(6) is or at any time has been after entry, a member of any of the following classes of aliens:

"(C) Aliens who are members of or affiliated with (i) the Communist Party of the United States . . . ."

in *Rowoldt* v. *Perfetto,* 355 U. S. 115, 120, it was held, in elaboration of *Galvan,* that the alien must have had a "meaningful association" with the Communist Party in order to be deportable. The evidence in the record, to which the standards set forth in these decisions must be applied, was all elicited at hearings before the Service's special inquiry officer in 1956. This evidence consists solely of the testimony of two government witnesses, petitioner having chosen to introduce no evidence.

The special inquiry officer entered a deportation order against petitioner on February 28, 1957. The Board of Immigration Appeals dismissed petitioner's appeal on November 14, 1957, on the ground that the record established his voluntary membership in the Communist Party. A few weeks later, this Court decided *Rowoldt* v. *Perfetto, supra,* and petitioner asked the Board to reconsider its decision in light of the opinion in that case. The Board denied the application, pointing out that the record as it stood still supported the deportation order. It did, however, order a reopening of the proceedings before the special inquiry officer so that petitioner might have a chance to offer rebuttal testimony and thereby bring himself, possibly, within the framework of the *Rowoldt* decision.

At the reopened hearing, however, petitioner's counsel took the position that on the record as it stood the Government had failed to establish Communist Party membership in the sense contemplated by the *Rowoldt* decision, and therefore chose not to offer further evidence. The Government also offered no additional evidence. The special inquiry officer reaffirmed his previous decision and the Board of Immigration Appeals on May 18, 1959, dismissed petitioner's appeal. Petitioner thereupon filed an action in Federal District Court for review of the deportation order. That court granted the Government's motion for summary judgment and dismissed the action. The United States Court of Appeals for the District of

Columbia Circuit affirmed the dismissal, 109 U. S. App. D. C. 267, 286 F. 2d 824, and this Court denied a petition for certiorari, 365 U. S. 871.

Petitioner read the Court of Appeals' opinion as suggesting that § 241 (a)(6)(C) would not have applied to him if he had introduced evidence that he had not personally advocated the forcible overthrow of the Government.[2] He therefore moved before the Board of Immigration Appeals that the deportation hearing be reopened to permit him to introduce evidence that he did not personally advocate the violent overthrow of the Government. The Board of Immigration Appeals heard oral argument on the motion and, on August 1, 1961, denied it.

Petitioner then brought the present action in the District Court, praying that the Board be ordered to reopen the deportation hearing and that the Attorney General and his agents be enjoined from enforcing the outstanding deportation order. A preliminary injunction to the latter effect was also requested. The court denied the motion for preliminary injunction on August 14, 1961, and the Court of Appeals summarily affirmed this denial on September 13. Petitioner filed a petition for certiorari in this Court to review the denial of preliminary injunctive relief, and THE CHIEF JUSTICE ordered deportation stayed until the petition should be disposed of. Meanwhile, summary judgment was granted the Government on the merits of petitioner's complaint, which was thereupon dismissed, a disposition which was summarily affirmed by the Court of Appeals on February 23, 1962. Petitioner filed an additional petition for certiorari to review this judgment. We granted both petitions. 371 U. S. 860. No. 39 involves the preliminary injunction,

---

[2] There is no dispute before this Court, nor could there be, that under *Galvan, supra,* at 528, the absence of personal advocacy of violent overthrow is not by itself a bar to deportability under § 241 (a)(6)(C). See pp. 473–474, *infra.*

and No. 293 relates to the ultimate dismissal of petitioner's complaint on the merits.

In determining whether, on the record before us, the Government has fulfilled its burden of proving that petitioner was a "member" of the Communist Party of the United States within the meaning of § 241 (a)(6)(C), we must recognize at the outset what the history of the times amply demonstrates,[3] that some Americans have joined the Communist Party without understanding its nature as a distinct political entity. The *Rowoldt* decision, as well as other decisions of this Court, reflects that there is a great practical and legal difference between those who firmly attach themselves to the Communist Party being aware of all of the aims and purposes attributed to it, and those who temporarily join the Party, knowing nothing of its international relationships and believing it to be a group solely trying to remedy unsatisfactory social or economic conditions, carry out trade-union objectives, eliminate racial discrimination, combat unemployment, or alleviate distress and poverty.[4] Although the Court specifically recognized in *Galvan, supra,* at 528, that "support, or even demonstrated knowledge, of the Communist Party's advocacy of violence was not intended to be a prerequisite to deportation," it did condition deportability on the alien's awareness of the "distinct and active political" nature of the Communist Party, *ibid.* This, together with the requirement of "meaningful association" enunciated in *Rowoldt, supra,* at 120, led the Court to declare later that in *Galvan* and *Rowoldt* it

[3] See, *e. g.,* Aaron, Writers on the Left (1961), 149–160; Decter, The Profile of Communism (1961), 50–51; Ernst and Loth, Report on the American Communist (1952), *passim;* Glazer, The Social Basis of American Communism (1961), 115 and *passim.*

[4] Compare *Yates* v. *United States,* 354 U. S. 298, 327–333; *Scales* v. *United States,* 367 U. S. 203, 222–223, 230–255; *Noto* v. *United States,* 367 U. S. 290.

had "had no difficulty in interpreting 'membership' . . . as meaning more than the mere voluntary listing of a person's name on Party rolls." *Scales v. United States,* 367 U. S. 203, 222.

The operation in practice of this wise distinction is illustrated by *Rowoldt,* to which we think the present case is analogous on its facts. In *Rowoldt,* the sole evidence in the record was Rowoldt's statement to an inspector of the Immigration and Naturalization Service, in the course of which he admitted voluntary membership but said nothing which indicated that he had been aware while a member that the Communist Party was a "distinct and active political organization." Mr. Justice Frankfurter, speaking for the Court, concluded that "[f]rom his own testimony in 1947, which is all there is, the dominating impulse to his 'affiliation' with the Communist Party may well have been wholly devoid of any 'political' implications." 355 U. S., at 120. The Court therefore decided that the record was too insubstantial to support the order of deportation. The same is true here. The testimony of the two government witnesses establishes only that between either late 1948 or early 1949 and the end of 1950 or early 1951 petitioner was a dues-paying member of a club of the Communist Party in Los Angeles, and that he attended about 15 meetings of his Party club, one executive meeting of the group, and one area Party convention.

One witness, Scarletto, testified to having joined the Communist Party in Los Angeles in 1947 "under the supervision of the F. B. I." At a date which he did not recall, but which he thought was in late 1948 or early 1949, Scarletto was assigned to the El Sereno Club, which "was one of the large divisions [of the Communist Party] which was split up later." There were "approximately 32 members in the El Sereno Club at that time," and Scarletto was the press director of the club. Scarletto was only in the El Sereno Club for "a few months" when

it "was split up into smaller units for security reasons." During these few months, Scarletto testified, he was introduced to petitioner at an El Sereno Club meeting and saw him there one other time. Since attendance at club meetings was restricted to Communist Party members, Scarletto inferred that petitioner was a member of the Party.

Scarletto was next assigned, some time in early 1949, to the Mexican Concentration Club, which, he testified, was also a unit of the Communist Party of the United States. Petitioner, he said, was put into the same new group. Scarletto shortly became organization secretary of this group, a job which, among other things, gave him the duty of collecting dues, and he testified that he collected dues from petitioner. Scarletto left the Concentration Club in early 1951, when he was transferred by the Party "to the underground."

Concentration Club meetings were held weekly. Petitioner, Scarletto testified, "just went once in awhile, but he was a regular member." Over the approximately two-year period of Scarletto's membership in the Concentration Club, during which he attended "most" of its meetings, he testified that he saw petitioner at "about 15" meetings. All but "a couple" of these, he said, were restricted to Communist Party members. Although meetings were held in members' homes, Scarletto did not recall any at petitioner's home and said that he himself had never been in petitioner's home. Scarletto did not remember whether petitioner ever held "an official position" in either the El Sereno Club or the Mexican Concentration Club. Finally, Scarletto, who attended Communist Party conventions in the Los Angeles area with some regularity, recalled seeing petitioner at one such convention. He said he himself attended these conventions in an official capacity, but did not know in what capacity petitioner attended, except that membership in the Party was a prerequisite to attendance.

The other witness, one Elorriaga, testified that he, too, joined the Communist Party in Los Angeles in 1947. He, too, was a member of the El Sereno Club, but did not meet petitioner until he was assigned to a smaller unit "known as the Forty-Fifth Concentration," which apparently was the same entity as the "Mexican Concentration Club" discussed by Scarletto. Elorriaga did not recall petitioner as being a member of the El Sereno Club. Elorriaga's testimony as to the frequency of petitioner's attendance at Concentration Club meetings was contradictory. After having testified on direct examination that he saw petitioner at three or four meetings a month, Elorriaga radically revised his estimate the next day on redirect examination to say that he saw petitioner at "about two or three meetings" in total, adding that "I was present at one meeting in 1951 and another in 1949 with . . . [petitioner]." [5] The over-all lack of precision of Elorriaga's answers to questions concerning petitioner is also suggested by a comparison of his assertion that petitioner must have been an official of the club "because he attended a few [of its] executive meetings," with his immediately following admission that he himself remembered being present at only one executive meeting with petitioner.

The evidence contained in the record is thus extremely insubstantial in demonstrating the "meaningful" char-

---

[5] Elorriaga's testimony on direct examination was as follows:

"Q. Now you say you met him in meetings of that club, how often would you say you saw the respondent in meetings of that club?

"A. How often, about maybe three or four meetings a month."

One possible explanation of the apparent contradiction is that Elorriaga understood the question on direct examination as merely an inquiry into how often club meetings were held, and answered accordingly. This is borne out to some extent by the fact that the witness gave his "revised" answer to the question on two separate occasions, some minutes apart, during the redirect examination.

acter of petitioner's association with the Party, either directly, by showing that he was, during the time of his membership, sensible to the Party's nature as a political organization, or indirectly, by showing that he engaged in Party activities to a degree substantially supporting an inference of his awareness of the Party's political aspect.[6]

---

[6] Since some activities may be engaged in without the requisite awareness, satisfaction of the Government's burden as to the ultimate fact of "meaningful association" by evidence of activities instead of by direct evidence of awareness of the Party's "distinct and active political" nature must be based upon evidence of activities sufficient to give substantial support to an inference of the alien's awareness of the Party's political aspect. The sole aspect of the witness Scarletto's testimony which might have implied that petitioner's association with the Party was "meaningful" was his reference to having seen petitioner at one Los Angeles area convention of the Party. However, in contrast to the testimony in *Niukkanen* v. *McAlexander*, 362 U. S. 390, note 7, *infra*, Scarletto neither described what petitioner would have heard at the convention nor suggested that there was any prerequisite such as officership or executive responsibility to petitioner's attendance at the convention. Scarletto said that the nature of such conventions generally was that "they would have discussions on what was going on in the Party, and what drives were coming up," but did not elaborate this statement with reference to the convention that petitioner attended or to what petitioner did there. Scarletto could only be sure that petitioner had to be a member to be present. The only facet of Elorriaga's testimony which touched upon the qualitative aspect of petitioner's membership was his statement that he had seen petitioner at one executive board meeting of the Party unit. However, in contrast to the testimony in *Galvan, supra,* at 524, 529, he only supposed petitioner to have been an "official of the club" because of petitioner's presence at an executive meeting which Elorriaga thought was "probably" limited to "officials of the club," and he did not elaborate specifically upon the significance of petitioner's presence at the one meeting, making only the general statement that "[a]t this time I cannot say definitely the purpose [of that meeting] but it was either organizational or to form an agenda for the regular meeting." Thus, none of the testimony of either Scarletto or Elorriaga was significantly probative of petitioner's "meaningful association" with the Party.

In one sense, indeed, this record is even less substantial in support of the deportation order than was the record in *Rowoldt,* because, although Rowoldt stated that he joined thinking the Party's aim was "to get something to eat for the people," 355 U. S., at 117, it was also true that he had worked as a salesman in a bookstore which was "an official outlet for communist literature," *id.,* at 118, and that he showed some awareness of Communist philosophy and tactics in response to questioning by the immigration inspector. Bearing in mind that the ultimate burden in deportation cases such as this is on the Government, it is apparent that here, as in *Rowoldt,* there is insufficient evidence to support the deportation order.[7]

---

[7] This Court's later *per curiam* decision in *Niukkanen* v. *McAlexander,* 362 U. S. 390, in no way qualified the meaning of *Rowoldt,* since the evidence in the record in *Niukkanen* clearly showed "meaningful association." See *Niukkanen* v. *McAlexander,* 265 F. 2d 825 (C. A. 9th Cir. 1959). Two witnesses testified for the Government. Both confirmed Niukkanen's Party membership and his regular attendance at meetings In addition, one witness testified that Niukkanen helped in the distribution of a Communist-controlled trade-union newspaper edited by the witness, and actively participated in discussions at the newspaper office and elsewhere pertaining to policies of the Communist Party and circulation of the newspaper as a Communist organ. This witness also testified that Niukkanen had attended a regional "plenum" of the Party—a meeting wherein all aspects of regional Party activities were reported on. Such a meeting, said the witness, was only for the "anointed people," the "top fraction" in the Party, to which, the witness added, Niukkanen belonged. The other witness, who had been a member of the same unit of the Party as Niukkanen, added that Niukkanen, although never an officer of the unit, was a member of its executive board.

Nor is *Galvan, supra,* which was decided before *Rowoldt,* inconsistent with either that case or the present one. Mr. Justice Frankfurter, who wrote the Court's opinions in both *Galvan* and *Rowoldt,* stated in *Rowoldt* that "[t]he differences on the facts between *Galvan* v. *Press, supra,* and this case are too obvious to be detailed." 355 U. S., at 121.

As against the slimness of the evidence that it introduced, the Government seeks the benefit of an inference, based upon petitioner's failure to produce or elicit evidence in response to the Government's proof that he paid dues to the Party and attended some meetings, that his association with the Party was "more than the mere voluntary listing of . . . [his] name on Party rolls." *Scales, supra,* at 222. It is a sufficient answer to the Government's argument to point out that, as recognized in *Galvan, supra,* at 530, and *Rowoldt, supra,* at 120, deportation is a drastic sanction, one which can destroy lives and disrupt families, and that a holding of deportability must therefore be premised upon evidence of "meaningful association" more directly probative than a mere inference based upon the alien's silence.[8]  Moreover, the fact is that the Government might well have asked its two witnesses about petitioner's knowledge of the Party as a political entity and about the qualitative nature of petitioner's activities in the Party. If it were the fact that petitioner was more aware of the Party's nature than this record shows, the Government's witnesses could likely have given testimony, either about petitioner's knowledge or about his Party activities, which would have tended to prove that awareness. With the facts concerning the nature of petitioner's association perhaps near at hand, and in light of both the possibility that those facts would not be consistent with a finding of "meaningful association" and the harshness of the deportation sanction, we cannot sustain petitioner's deportation upon a bare inference which the Government would have us derive from petitioner's failure to introduce evidence in

---

[8] In the present case, for example, deportation would remove a man who has resided in this country since 1920 when he came from Mexico as a 10-year-old boy, and has raised and supported a family who are all American citizens.

response to the Government's proof of his dues-paying membership and sometime attendance at Party meetings.

We are hence confronted with a case in which the Government did not sustain its burden of establishing that petitioner was a meaningful member of the Party as contemplated by § 241 (a)(6)(C). To paraphrase the holding of *Rowoldt, supra,* at 120: from the testimony of the two government witnesses, which is all there is, the dominating impulse to petitioner's affiliation with the Communist Party may well have been wholly devoid of any "political" implications. We hold that, on the record before us, the deportation order against petitioner is not supported by substantial evidence, *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, and therefore cannot stand.[9]

*Judgment reversed.*

MR. JUSTICE WHITE, whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

Petitioner is charged with being an alien who after entry had become a member of the Communist Party, and thus subject to deportation under § 241 (a)(6)(C) of the Immigration and Nationality Act of 1952. Hearings were held from April through July 1956, at which the United States introduced testimony of two witnesses as to petitioner's affiliation with Communist Party units in Los Angeles from 1949 to 1951, but petitioner refused to answer any question concerning his membership in the

---

[9] Our disposition of the case makes it unnecessary to consider petitioner's contention that "at least the spirit" of 28 U. S. C. § 46 was violated when the panel of the Court of Appeals assigned to hear petitioner's appeal in the current series of proceedings transferred the appeal instead to the same panel which had heard his first appeal, 109 U. S. App. D. C. 267, 286 F. 2d 824, it being clearly predictable that one of the three judges on that panel would not participate, since he had been unable to participate in the disposition of the first appeal.

Communist Party. The special inquiry officer found petitioner deportable under § 241 (a)(6)(C) and the Board of Immigration Appeals dismissed the petitioner's appeal on November 14, 1957, holding that the evidence established a prima facie case of membership which petitioner made no attempt to rebut. On January 13, 1958, after this Court's decision in *Rowoldt* v. *Perfetto,* 355 U. S. 115, the Board of Immigration Appeals reconsidered petitioner's case in light of *Rowoldt.* Noting that, unlike the petitioner in *Rowoldt*, petitioner here had offered no evidence which would upset the normal inference of political awareness flowing from his two-year association with the Communist Party at a time when the purposes and activities of the Party were a matter of public record, the Board granted petitioner's request to reopen the proceedings in order that he might present testimony which would bring him within *Rowoldt.* At the reopened hearings, however, petitioner offered no evidence but merely introduced a statement asserting that the existing record did not establish meaningful membership and suggesting that the Government present additional evidence. The special inquiry officer, after re-examining the record, adhered to his original conclusion that the evidence showed voluntary, meaningful membership in the Communist Party. On appeal to the Board of Immigration Appeals, that body, after examining the record again, reaffirmed its decision that the testimony established meaningful membership within the *Rowoldt* case. Petitioner filed a petition for declaratory and injunctive relief in the District Court to review the deportation order and, after still another examination of the order and the supporting record, the court granted the Board's motion for summary judgment. The Court of Appeals held that "the findings of the Board that [petitioner's] Party membership was meaningful is established by the record," 109 U. S. App. D. C. 267, 271, 286 F. 2d 824, 828,

and affirmed. In a petition for certiorari to this Court, petitioner argued that the evidence was insufficient to support the deportation order, but certiorari was denied, 365 U. S. 871.

Petitioner thereupon commenced the proceedings which bring the case before us today. He filed a motion to reopen the proceedings before the Board of Immigration Appeals on the ground that he should be permitted to testify that he never personally advocated the overthrow of the Government by force and violence. While not disputing that an inquiry into whether an alien personally advocated violent overthrow is immaterial in deportation proceedings, *Galvan* v. *Press*, 347 U. S. 522, petitioner nonetheless insisted upon introducing the testimony because, as he read the opinion of the Court of Appeals, 109 U. S. App. D. C. 267, 286 F. 2d 824, proof that an alien did not personally espouse the cause of violent overthrow of the Government would save him from deportation under § 241 (a)(6)(C). The Board of Immigration Appeals declined to reopen the proceedings again, because in its view the Court of Appeals did not announce the rule on which petitioner relied and because *Galvan* v. *Press* and *Rowoldt* v. *Perfetto* so clearly held that proof of such a personal commitment to the tenet of violent overthrow was not required for deportation proceedings. After reviewing the record for the third time, the Board concluded that "there is uncontradicted testimony to show that a voluntary meaningful membership existed." Petitioner filed his second action for judicial review, contending that the refusal to reopen the hearings so that he could submit his testimony was "erroneous, unconstitutional and illegal." The District Court, finding no abuse of discretion in the Board's refusal to reopen the proceedings, declined to disturb the deportation order. The Court of Appeals affirmed, the case was brought here and the Court now reverses. I respectfully dissent.

*First.* The issue tendered to the District Court was whether the Board of Immigration Appeals should have reopened the record to allow petitioner to present evidence of the kind stated in the affidavit attached to the complaint. Both the District Court and the Court of Appeals upheld the Board's refusal to reopen the proceedings. The Court here does not disagree, nor does it suggest that the evidence which petitioner sought to add to the record was in any way material to the question of deportability under the statute. Instead, it decides that the record does not show meaningful or voluntary membership, thus resurrecting an issue supposedly settled in previous proceedings in this case, an issue which the courts below time after time decided contrary to the view now taken by this Court and an issue which the Court itself previously declined to review by certiorari. A wise use of the Court's powers would confine decision here to the issue presented to the District Court, rather than afford repeated review of previously decided matters and so call into question the integrity of the administrative and judicial process.

*Second.* *Shaughnessy* v. *Pedreiro,* 349 U. S. 48, held that an alien could, by bringing an action for declaratory judgment and injunction, secure judicial review of a "final" order of deportation under § 10 of the Administrative Procedure Act. This is such an action, as the complaint expressly states, and affirmance of the order of deportation is required in this case unless the administrative findings are not supported by substantial evidence. Although the order must "be set aside when the record before a Court . . . clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both," review under § 10 does not "mean that even as to matters not requiring expertise a court may displace the Board's

choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 488, 490. "It is . . . immaterial that the facts permit the drawing of diverse inferences. The [agency] alone is charged with the duty of initially selecting the inference which seems most reasonable and [its] choice, if otherwise sustainable, may not be disturbed by a reviewing court." *Cardillo* v. *Liberty Mutual Co.,* 330 U. S. 469, 478.

If *Galvan* v. *Press* and *Rowoldt* v. *Perfetto* are not to be overruled, or substantially modified, neither of which petitioner has requested here, and if the substantial evidence rule is not to be abandoned, there is ample basis on this record to sustain the finding of voluntary, meaningful membership. Petitioner was a regular dues-paying member of the Party, at least from 1949 to 1951, and there is no evidence that his membership terminated at the latter date. When the Party was reorganized into smaller units, petitioner was transferred to a new group and he was seen 15 times ("it could be 15, it could be more") at meetings of the unit which were restricted to Party members. "He was an official of the club because he attended a few executive meetings of the Forty-Fifth," at one of which he was seen by the government witness. This meeting was "either organizational or to form an agenda for the regular meeting." Attendance at executive meetings was restricted "to Party members and probably officials of the club." At one time petitioner was transferred out of the Mexican Concentration Club "for some other job." Petitioner was also known to have attended at least one Party convention, attendance at which was restricted to Party members—"you had to face the panel and give your club, your position of that club, and be identified by members that were on the, on this panel, before you were admitted." At the conventions,

"they would have discussions on what was going on in the Party, and what drives were coming up."

These facts are sufficient basis for the Board's finding of voluntary, meaningful membership.* After regular attendance at Party meetings and functions, and regular financial support for its activities, it is rather fanciful to believe petitioner was still unaware of the political nature of the Communist Party. It is doubtful that the meetings were so ineptly run or structured.

To be sure, facts purporting to show voluntary membership can be explained away and rendered meaningless by further facts as in *Rowoldt*. But here petitioner did not testify and did not attempt to characterize or to limit the significance of his association with the Party. In the circumstances "it is enough that the alien joined the Party, aware that he was joining an organization known as the Communist Party which operates as a distinct and active political organization, and that he did so of his own free will. A fair reading of the legislation requires that this scope be given to what Congress enacted . . . ." *Galvan* v. *Press*, 347 U. S., at 528.

I would therefore affirm the repeated holdings of the courts below, made after several thorough examinations of the record. "This is not the place to review a conflict

---

*The Court is concerned about the insufficiency of the "direct" and "indirect" evidence of awareness and participation. The record, though, contains "direct" evidence from Scarletto, who saw petitioner at Party meetings and at a convention, and who testified that at such conventions "they would have discussions on what was going on in the Party." Elorriaga stated that he saw petitioner at an executive meeting "either organizational or to form an agenda for the regular meeting." Both witnesses testified "directly" that petitioner was a dues-paying member and attended Party meetings. To me this uncontradicted testimony plainly is "direct" evidence that petitioner was aware of the distinct and active political nature of the Communist Party or at the very least sufficient "indirect" evidence from which an inference of meaningful membership could be drawn.

of evidence nor to reverse a Court of Appeals because were we in its place we would find the record tilting one way rather than the other, though fair-minded judges could find it tilting either way." *Labor Board* v. *Pittsburgh S. S. Co.,* 340 U. S. 498, 503. "We do no more on the issue of insubstantiality than decide that the Court of Appeals has made a 'fair assessment' of the record." *Federal Trade Comm'n* v. *Standard Oil Co.,* 355 U. S. 396, 401; *Peurifoy* v. *Commissioner,* 358 U. S. 59, 61; *Labor Board* v. *Pittsburgh S. S. Co.,* 340 U. S. 498, 502. "This Court will intervene only in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied." *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 491.