AMERICAN COMMITTEE FOR PRO-
TECTION OF FOREIGN BORN,
Petitioner,

v.

SUBVERSIVE ACTIVITIES CONTROL
BOARD, Respondent.

No. 15960.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 3, 1962.

Decided Dec. 17, 1963.

Certiorari Granted April 27, 1964.
See 84 S.Ct. 1181.

———◆———

Mr. Joseph Forer, Washington, D. C.,
for petitioner.

Mr. George B. Searls, Atty., Dept. of
Justice, with whom Mr. Frank R. Hunter,
Jr., Gen. Counsel, Subversive Activities
Control Bd., Mr. Kevin T. Maroney, Mrs.
Lee B. Anderson, Messrs. Benjamin F.
Pollock and Robert L. Keuch, Attys.,
Dept. of Justice, and Messrs. Charles F.
Dirlam and Peter P. Hanagan, Attys.,
Subversive Activities Control Bd., were
on the brief, for respondent.

Mr. Edward J. Ennis, New York City, filed a brief on behalf of the American Civil Liberties Union, as amicus curiae.

Before BAZELON, Chief Judge, PRETTY-MAN, Senior Circuit Judge, and DANA-HER, Circuit Judge.

PRETTYMAN, Senior Circuit Judge.

Petitioner is before the court seeking to have set aside an order of the Subversive Activities Control Board issued June 27, 1960, requiring it to register with the Attorney General as a Communist-front organization pursuant to the provisions of the Internal Security Act, Section 7.[1] On January 8, 1962, after a petition for review had been filed, this court remanded to the Board for purposes not now relevant. The Board issued its Report on Reconsideration on March 18, 1962. That report and the original report of the Board are now before us. Oral argument was heard in October of 1962.

The American Committee for Protection of Foreign Born was organized in 1932 or 1933 and has its main offices or headquarters in New York City. Its activities have centered around "the foreign born with considerable effort and attention given to the legal and propaganda defense of individuals involved in deportation and denaturalization cases." Many of those defended have been members of the Communist Party, and many have not been. The Board also found that the Communist Party has a "continuing policy" in this area. The Board said:

"The aims and purposes of the Party have been: (a) to seek to prevent the denaturalization and deportation of officers and members of the Party, and (b) to win the goodwill of the foreign born and obtain from them adherents to and support for the Party and for Party programs. The record also shows that it was the policy of the Communist Party to carry out and advance these aims and purposes through and by an organization separate from and not a part of the Communist Party as such."

The Board concluded that petitioner operates to serve this twofold purpose of the Communist Party and is substantially "directed, dominated, or controlled by the Communist Party of the United States, a Communist-action organization * * * and * * * primarily operated for the purpose of giving aid and support to such Communist-action organization."

■■ In reaching the result required by the evidence in this case, we need not attempt to resolve the constitutional questions advanced by petitioner. However, in determining whether there is a "preponderance" of evidence to support the Board's conclusions, it must be kept in mind that the Subversive Activities Control Act requires the Attorney General to make a particular showing as to Communist organizations before the requiring of registration can be constitutionally upheld. " 'So long as no more is involved than exercise of the rights of free speech and free assembly, [an organization] is immune to such a restriction.' [Citing Thomas v. Collins, 323 U.S. 516, 540, 65 S.Ct. 315, 89 L.Ed. 430.] The present statute does not, of course, attach the registration requirement to the incident of speech, but to the incidents of foreign domination and of operation to advance the objectives of the world Communist movement—operation which, the Board has found here, includes extensive, long-continuing organizational, as well as 'speech,' activity."[2] "The statute is not applied like a spray to all persons who hold certain ideas or who may become tainted by brushing against ideas or people."[3]

---

1. 64 Stat. 993, as amended, 50 U.S.C. § 786.

2. Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 90, 81 S.Ct. 1357, 1407, 6 L.Ed. 2d 625 (1961).

3. Washington Pension Union v. Subversive Activities Control Board, 116 U.S.App. D.C. 185, 322 F.2d 398 (D.C.Cir. 1963).

In an earlier opinion in this series of cases,[4] this court has said that, before it will sustain a finding that an organization is controlled and dominated by the Communist Party, the Government must present proof which is "specific, direct and timely." "[T]he Communist Party appears, and was declared by the Congress, [citing Sec. 2(15), Subversive Activities Control Act of 1950, 64 Stat. 989, 50 U.S.C. § 781(15)], to be a rigidly disciplined, well-organized, active organization. Its management is real, not happenstance, and its representation is definite, not whimsical. Mere membership does not establish active management or responsible representative capacity."[5]

In recent months the Supreme Court itself has inquired into the adequacy of proof of Communist infiltration before it would sanction a legislative inquiry into the membership lists of the involved organization. "The strong associational interest in maintaining the privacy of membership lists of groups engaged in the constitutionally protected free trade in ideas and beliefs may not be substantially infringed upon such a slender showing as here made by the respondent. While, of course, all legitimate organizations are the beneficiaries of these protections, they are all the more essential here, where the challenged privacy is that of persons espousing beliefs already unpopular with their neighbors and the deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association is consequently the more immediate and substantial."[6]

The Supreme Court has also spoken on the right of an organization and "its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights." In this regard the Court said:

"[L]itigation * * * is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression. Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts. Just as it was true of the opponents of New Deal legislation during the 1930's, for example, no less is it true of the Negro minority today. And under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances."[7]

With these principles in mind we turn to the case at bar. As we have noted, our petitioner devotes "considerable effort and attention * * to the legal and propaganda defense of individuals involved in deportation and denaturalization cases." Indeed this appears to be its main interest and activity. It has a constitution. It has officers and honorary officers. It holds an "Annual Conference" each year, to which any and all members of the public are welcome and in which they may participate upon payment of the registration fee. It has an executive committee, elected by the annual conference, and it has full-time, paid administration officers. It has been in continuous operation since its organization. It seems clear, and the Board found, that the active directing force in the Committee was its executive secretary, Abner Green. Second to him was his assistant, Harriett Barron. The evidence was overwhelming that the

4. National Council of American-Soviet Friendship, Inc. v. Subversive Activities Control Board, 116 U.S.App.D.C. 162, 322 F.2d 375 (1963).

5. Idem.

6. Gibson v. Florida Legislative Committee, 372 U.S. 539, 555–557, 83 S.Ct. 889, 898–899, 9 L.Ed.2d 929 (1963).

7. National Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 428–430, 83 S.Ct. 328, 335–336, 9 L.Ed.2d 405 (1963).

**56**

board of directors and the annual conferences were perfunctory, as such boards and conventions so frequently are in unincorporated associations, and the real direction and control were in the hands of the chief executive officer. It was clearly established that Green and Barron were members of the Communist Party.

We have discussed at length the meanings of various provisions of the Internal Security Act of 1950.[8] We will not repeat that discussion here.

We inquire first into the management, or control, interrelationship of the Committee and the Communist Party. This is clause (A) of the statutory definition of a Communist front.[9]

It is not claimed, and the Board did not find, that Green or Barron were active in the management or control of the Party. But the first "criterion" in the statute [10] includes also the extent to which the active director of the named organization is a representative of the Party. A representative, obviously, need not be a participant in the management of his principal.

There was direct and specific testimony that Green was put at the head of the Committee by authority of the Party. The witness Lautner testified that he and one Landy, both of the Nationality Groups Commission of the Party, were delegated by the Central Committee of the Party to decide upon the leadership of the Committee for Protection of Foreign Born. They named Green, "and that decision was carried out."

 Green on the witness stand flatly contradicted Lautner, but this created a problem of credibility, which was for the trier of the facts who saw and heard both witnesses. The Act provides that findings shall be supported by a preponderance of the evidence, but evidence which is not believed by the trier of the facts has no weight in that scale. Of course the fact-finder cannot be arbitrary. But in the case before us that complication does not appear to be a real one on this point, despite the claims of the Committee.

Green said that he was made head of the organization through election by an annual convention. But convention election of officers already actually selected by one person or a small group of people is a commonplace. The election by the convention does not contradict Lautner's account.

There was direct and specific evidence that Green and Barron attended Party meetings, were advised of Party policies, and carried out those policies in the work of the Committee. In its published account (Political Affairs, Feb., 1951) of its 15th National Convention, the Party recited the advice of W. Z. Foster that the Party not become a "defense organization" but should carry on defense work through "[a] separate permanent nonpartisan organization devoted exclusively to this purpose". In the next section of that same publication, the Civil Rights Congress, hailed as the logical inheritor of the fighting spirit, record and experiences of the I.L.D., and our petitioner Committee, "led by the devoted and indefatigable Abner Green," were coupled for praise, and "all progressives" were called upon to support their work. The witness Lautner, who, as we have said, was a minor Party official, testified that he was elected to the credentials committee of a conference of the Committee and was put on the executive committee of the Committee.

8. Labor Youth League v. Subversive Activities Control Board, 116 U.S.App.D.C. 151, 322 F.2d 364 (1963); National Council of American-Soviet Friendship, Inc. v. Subversive Activities Control Board, 116 U.S.App.D.C. 162, 322 F.2d 375 (1963); Veterans of Abraham Lincoln Brigade v. Subversive Activities Control Board, 117 U.S.App.D.C. ——, 331 F. 2d 64 (1963).

9. Sec. 3(4) (A), 64 Stat. 989, 50 U.S.C. § 782(4) (A).

10. Sec. 13(f) (1), 64 Stat. 1000, 50 U.S.C. § 792(f) (1).

The evidence is direct and plentiful that the Party took an active part in the organizing of the regional Committees for Protection of Foreign Born, of which there were several. The evidence is ample that the officers of the regional Committees were members of the Party, sometimes minor officers in the Party, such as district directors, and that other such Party officials participated not only in the organization of these Committees but in their programs. It is clear that Green participated in such activities. There is much discussion in this record, and here, as to whether these local groups were autonomous organizations or were integral parts of our petitioner, the national Committee. We think the point is unimportant. It is abundantly clear that, whatever the technicalities may be as to the nature of these unincorporated associations, they were intermeshed with the national group, not only in policies but in operation. The issues of *The Lamp*, the Committee publication, on file here as exhibits, amply prove this situation.

In determining Green's status as a Party representative *vel non* the Board, under the statutory direction, took into consideration the extent to which the Committee supported the Party, was supported by it, and abided its policies; *i. e.,* the other three "criteria" in Section 13(f).

Turning then to these other "criteria", evidence of support of the Committee by the Party, and the identity of the positions and policies of the Party and the Committee, is ample to support the conclusions of the Board on those features. The record is replete with instances in those respects, and they seem to have been continuous from the early 1940's to the time of the hearing before the Board in 1954. We have no difficulty with these features of the findings.

Whether the Committee was operated primarily to aid and support the Party, and the extent to which its resources and personnel were used to further or promote the objectives of the Party, which are clause (B) of the statutory definition and the third of the "criteria", pose questions. The Supreme Court has held that "primarily" does not necessarily mean principally; it may mean merely substantially.[11]

The Committee for Protection of Foreign Born (our petitioner) undoubtedly devoted the major portion of its efforts to contesting the deportation of aliens and promoting their naturalization. It furnished counsel and material in court cases in that area, issued statements, made pleas, and in every possible way battled in this behalf. It also fought the Internal Security Act and other statutes and proposed legislation, but the major thrusts of its offensive seem to have been the naturalization and deportation features of those measures. The Committee fought in behalf of many members of the Communist Party. There is some dispute as to the proportion of the persons it aided who were Party members. But there is no dispute as to the fact that it enlisted in behalf of many non-Communists.

Obviously the naturalization of its members and the prevention of their deportation were direct aims and purposes of the Communist Party. And a more subtle factor is present. The foreign-born constitute one of the likeliest reservoirs of potential disciples for Communism in this country. Many of these people are less fearful of foreign influence or less attuned to the basic concepts of this nation than are their second and subsequent generations. The Party made an official declaration along these lines early in the 1930's. To establish itself as the champion of the foreign-born and to imprint such an image of itself on the public mind would obviously be of major benefit to the Party. But the protection of the rights of the foreign-born is not only a laudable objective; it is a basic one in this country.

11. Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 446, 67 S.Ct. 411, 91 L.Ed. 408 (1947).

This is true not only theoretically and philosophically but also historically and factually. What, then, of an organization which vigorously devotes itself to the protection of the rights of all and any foreign-born who seek its help? Is it to be held a Communist front because the ends sought are Communist aims? Of course not. But, if in espousing causes which are Communist objectives an organization does so because of Communist control and direction, is it then a Communist front? To reach an answer to this question we think we must trace the pertinent considerations from their base. The Congress found and declared as a fact that the Communist movement is a world-wide revolutionary movement whose purpose it is, by any means deemed necessary, to establish a Communist totalitarian dictatorship throughout the world. The Supreme Court has told us that we must accept as established facts these findings, and others which we shall recite, of the Congress.[12] The Congress further found that the Communist dictatorship, vested in a foreign country, operates by causing the establishment in various countries of action organizations which are controlled by that foreign power. It has been established by a process of administrative and judicial inquiry in this country that the Communist Party of the United States is such an action organization.[13] The Congress further found as a fact that these action organizations operate to a substantial extent through "fronts", which in most instances are created or used in such manner as to conceal their true character and purposes, and that a result of this method is to obtain support from persons who would not extend such support if they knew the true purposes of, and the actual nature of, the control and influence exerted upon such "fronts". The Congress also found as a fact that "One device for infiltration by Communists is by procuring naturalization for disloyal aliens who use their citizenship as a badge for admission into the fabric of our society."[14] Upon the basis of these Congressional findings, which, as we have said, we must accept, we evaluate the record before us.

In the foregoing context it is indubitably clear that any laudable, praiseworthy activity which is identified in the public mind with the Communist Party or with Communism, or is so identified in the minds of those being aided by the effort, or is identified as being within the community of policies advocated by the Party, is a benefit to and naturally an objective of the Party. The identification of itself with laudable causes would, of course, be a benefit to the Party, as it is to any organization. The identity of its prominent members with such causes is also a worthwhile project for an organization seeking power among the public. More subtle and less effective, but perhaps the only route to public acceptance available to a clandestine operator is to create a picture of a community of interest between its own causes and interests which bear public acclaim. This is indeed a subtle business, but if effectuated it would be a real and substantial aid and support to the Party. This is one of the theses of the statute. The Congress declared that the Communist movement attracts strength to itself by operating behind a facade of good deeds.

The statute does not seek the registration of an organization devoted to the protection of the rights of the foreign-born. It seeks the registration of any organization the purpose of which, under control of the Party, by any activity, laudable or otherwise, is to strengthen the power of the Communist Party in this country.

12. Galvan v. Press, 347 U.S. 522, 529, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

13. Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

14. 64 Stat. 989 (1950), 50 U.S.C. § 781 (14).

The American Committee, by constant utterances and by its public attitude on issues apart from naturalization and deportation, vigorously identified its cause with causes of the Communist Party. One cannot read its declarations without gaining an impression that the cause of Communists threatened with deportation is the cause of all people so threatened and that Communist leaders are leading the effort on behalf of all.

The official organ of the Committee was *The Lamp*, published monthly in New York. It reflects the activities of the organization. Copies of issues from March, 1944, to January, 1954, are in the record. This paper carried current accounts of developments in cases and events in which the Committee was interested. It followed the *Harisiades* case and the *Terminal Island Four* case throughout their histories. From time to time it announced new arrests in deportation proceedings—sometimes twenty-five at a time, or an alleged total of some three hundred. It carried small news notes on the progress of deportation cases, the grant or denial of bail, and the results of petitions for habeas corpus and appeals to the courts. It announced conferences and committee meetings, the formation of special defense committees in particular cases, and the publication of booklets on special cases. The meetings of the various area Committees for Protection of Foreign Born were announced in some detail. It appealed for funds and carried strong editorials condemning what it termed "The Deportation Drive". In short, *The Lamp* was a vigorous, well-prepared, constant advocate of the rights of the foreign-born. Some of its extended campaigns were for repeal of the Walter-McCarran Act (its name for the Internal Security Act of 1950), support of the Lehman-Celler bill, the right to bail in deportation cases, opposition of denaturalization, and the status and problems of Mexican-Americans. From time to time it announced it was currently engaged in as many as 325 deportation cases and more than 40 denaturalization cases. Its total income ran as high as $43,500 and its expenses about that much. Abner Green served a federal prison sentence for refusing to reveal the names of contributors. It carried news about the activities of organizations of nationalities—Hellenic American Brotherhood, for example.

Through all these activities runs a prominent thread of Communist interest. The Committee took vigorous positions in respect to the Gerhardt Eisler affair. Eisler was foreign-born, to be sure, but this was not a naturalization or deportation matter; quite the contrary, in fact. The controversy which swirled about Eisler concerned his membership in the Communist Party and his refusal to testify before the House Committee.[15] The provisions of the Internal Security Act which were the targets of the Committee's attacks were those which required the deportation of aliens who were or had been members of the Communist Party. The Committee maintained that these provisions were premised on political opinion and threatened the freedom of all American people to their political opinions. This, of course, is Communist doctrine, but so far as this Government is concerned the point was put at rest by the Congressional findings to which we have referred. The deportation of Peter Harisiades, which the Committee called a test case and opposed with all the resources at its command, was on the ground that he was a member of the Communist Party.[16] The Internal Security Act is directed also at Fascists and all sorts of totalitarians. But we do not find in this record evidence that the Committee fought in behalf of Fascist aliens. Indeed it expressed a hearty antagonism to adherents of that thesis.

15. Eisler v. United States, 83 U.S.App. D.C. 315, 170 F.2d 273 (D.C.Cir.1948), cert. dismissed, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949); 84 U.S.App. D.C. 404, 176 F.2d 21 (D.C.Cir.), cert. denied, 337 U.S. 958, 69 S.Ct. 1534, 93 L. Ed. 1758 (1949).

16. Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

The Committee campaigned for repeal of the Smith Act of 1940 [17] and in defense of those indicted under it. When, in March of 1952, the Supreme Court ruled on a group of cases involving problems of members of the Communist Party under various sections of the so-called McCarran Act, *The Lamp* said: "In a series of three opinions, the U. S. Supreme Court has made far-reaching decisions destroying many of the democratic rights accorded non-citizens and jeopardizing, thereby, the liberties of all Americans, native as well as foreign born. * * * In a statement, the ACPFB [this Committee] declared that the U. S. Supreme Court had deserted its duty to protect the Bill of Rights * * *." Of the same events *The Worker* (issue of March 16, 1952), an official organ of the Communist Party, said:

"ANOTHER MONDAY — Supreme Court decision day—has passed and another gaping hole has been torn in the Bill of Rights by the war-thirsty Court majority.

"In trampling upon the rights of foreign born non-citizens, the court has destroyed the constitutional rights of foreign-born citizens as well, and threatened the rights of the native born."

 Testimony of Immigration officers was that the "bulk" of the three hundred deportation cases which the Committee at one time said it was defending involved allegations that the persons involved were members of the Communist Party. The terms used by *The Lamp,* the epithets applied to Government officials and their activities, are in tune with the utterances and attitudes of the Communist Party, expressed by its leaders and its publications.

Thus, then, the total picture in this record, viewed in the light of the statutory definition and the supporting "criteria", is of Abner Green as the directing force in the petitioner Committee, his selection for the post by authority of the Central Committee of the Communist Party, his attendance upon policy meetings of the Party, the vigorous support of him and the petitioner Committee by the Party, the identity of the objectives of the Committee and objectives of the Party, the similarity of Committee policies and Party policies in related areas, the notable Party overtones of Committee expression, and the direct involvement of Party members in a great proportion of the Committee's direct efforts. A Communist front is not declared by the Congress to be an action group; it is declared to be a facade behind which the Party, through designated representatives and control, works to strengthen itself in this country. When all the foregoing considerations are put together it seems to us that the conclusion of the Board that the Committee, our petitioner here, was a Communist front within the terms of the statute was well founded. In the *Communist Party* case the Supreme Court told us:

"The existence of direction, domination, or control in each instance is an issue of particular fact. The question whether in the case of a given organization such a compulsion or impulsion arises from the complex of ties which link it to a foreign government or organization that it will, because of those ties alone, adhere in its conduct to decisions made for it abroad, is one which Congress has committed, in the first instance, to an expert trier of fact. * * * Our decision in Rochester Telephone Corp. v. United States, 307 U.S. 125 [59 S.Ct. 754, 83 L.Ed. 1147], is especially apposite here. * * *

[W]e said: 'Investing the Commission with the duty of ascertaining "control" of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand.' " [18]

17. 54 Stat. 670.

18. Supra note 13, 367 U.S. at 40–41, 81 S. Ct. at 1381–1382, 6 L.Ed.2d 625.

Petitioner raises other points of law—the decision that the Communist Party is a Communist-action organization is not binding in this proceeding, and the registration provisions of the Internal Security Act are unconstitutional. We have ruled upon those points in other cases, to which we have referred, *supra*. Relying upon them we reject our present petitioner's contentions in those regards.

The order of the Board in this case will be

Affirmed.

BAZELON, Chief Judge (dissenting).

The Subversive Activities Control Act [1] aims to prevent a world-wide Communist conspiracy from accomplishing its purpose in the United States. § 2(15). Section 3(3) defines "Communist-action organization" as an organization which "(i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in section 2 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement * *." Those objectives are "the overthrow of existing government by any means necessary and the establishment in its place of a Communist totalitarian dictatorship." Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 89, 81 S.Ct. 1357, 1406–1407, 6 L.Ed.2d 625 (1961).

Section 3(4) of the Act defines "Communist-front organization" as an organization that "(A) is substantially directed, dominated, or controlled by a Communist-action organization, and (B) is primarily operated for the purpose of giving aid and support to a Communist-action organization, a Communist foreign government, or the world Communist movement * * *." The Communist Party is a Communist-action organization. But I think the Board has not shown that the American Committee for Protection of Foreign Born "(B) is primarily operated for the purpose of giving aid and support" to the Communist Party.[2] "The findings of the Board as to the facts, if supported by the preponderance of the evidence, [are] conclusive." § 14(a). But what the Act means is a question of law for the court.

Congress might have made Communist control the sole test of a "Communist-front organization." But Congress chose to include in the definition a purpose element as well as a control element. Also, Congress chose not to outlaw the Communist Party or prohibit all of its activities. Besides the objectives of overthrowing the government and establishing a dictatorship, the Party has innocent objectives and innocent activities. These are known to include, *e. g.*, promoting public school integration. They have been shown to include contesting the deportation of aliens and promoting their naturalization. Congress did not say, and I think Congress did not mean, that a "purpose of giving aid" to a Communist-action organization in promoting an innocent objective makes an organization which it controls a Communist-front organization. I think the word "purpose" in § 3(4) should be read in connection with the word "objectives" in § 3(3). This context indicates that "purpose" is intended and should be understood to be limited to the purpose of aiding a Com-

---

1. 64 Stat. 987 (1950), 50 U.S.C. § 781 et seq. (1958).

2. Although Congress juxtaposed the word "substantially" in § 3(4) (A) with "primarily" in § 3(4) (B), the majority nonetheless says that "primarily" means "substantially." Majority Opinion p. 57. To support this construction of the Subversive Activities Control Act, reference is made to the Banking Act of 1933 where, in a widely different context, the word "primarily" appears alone. I think the word "primarily" in § 3(4) (B) must be given its ordinary dictionary meaning of "principally" or "chiefly."

I have not considered the Board's finding that the American Committee "(A) is substantially directed, dominated, or controlled" by the Communist Party.

munist-action organization to advance the objectives of the world Communist movement.

The way in which the Act deals with Communist-front organizations confirms this understanding. The Act does not stop with requiring these organizations to register and furnish information. Most of the severe penalties prescribed in §§ 5(a) and 6(a) of the Act apply not only to members of Communist-action organizations but to members of Communist-front organizations also.[3] These sections of the Act make it "unlawful" for members of either sort of organization to hold any non-elective office or employment under the United States, or to be employed by any labor organization, or to use a passport, or even to apply for a passport. The validity of these severe penalties is not now before us. But in my opinion their severity shows that Congress had no intention of inflicting them on otherwise innocent people merely because of membership in otherwise innocent organizations that the Communist Party uses to advance an innocent aim.

Moreover a limited interpretation of the term Communist front is necessary if serious constitutional questions are to be avoided. The *Communist Party* case determines that constitutional rights including freedom of speech are not violated by enforcing the registration and information requirements of the Act against organizations that are primarily operated for the purpose of overthrowing the government and establishing a totalitarian dictatorship. 367 U.S. at 104–105, 81 S.Ct. at 1414–1415, 6 L.Ed. 2d 625. But it is quite doubtful that these same requirements may constitutionally be enforced against an organization that is not shown to have the same or similar purposes. It is even more doubtful that the severe penalties of §§ 5(a) and 6(a) may constitutionally be

inflicted on the members of such an organization. Although the last question is not now before us, it is bound to arise if "Communist-front organization" is finally given the broad interpretation which this court now gives it.

Activities protected by the first amendment cannot be restrained because of association with an organization some of whose activities are not so protected. In DeJonge v. Oregon, 299 U.S. 353, 57 S. Ct. 255, 81 L.Ed. 278 (1937), the Supreme Court held that although the Communist Party was engaged in unlawful activities, punishing a member for helping the Party conduct a meeting that had only lawful purposes violated his constitutional right of free speech. The Court said:

> "The holding of meetings for peaceable political action cannot be proscribed. * * * The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects." [299 U.S. at 365, 57 S.Ct. at 260, 81 L.Ed. 278.]

In Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), the Court sustained the constitutionality of a broad clause of the Smith Act directed against members of the Communist Party by interpreting the clause as intended to apply only to those members who intend to engage in or further the Party's sinister activities. The Court said: "Thus the member for whom the organization is a vehicle for the advancement of legitimate aims and policies does not fall within the ban of the statute * * *." 367 U.S. at 229, 81 S.Ct. at 1486, 6 L.Ed.2d 782.[4]

This court does not directly express a conclusion with regard to the Commit-

---

3. Section 5(a) (1) (D) prohibits employment in defense facilities of members of Communist-action organizations only. See also §§ 6(b), 7(d) (4), and 8.

4. Cases such as American Communications Ass'n C. I. O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Killian v. United States, 368 U.S. 231, 82

tee's purpose. It does say that the Board's conclusion that the Committee "was a Communist front within the terms of the statute was well founded." Majority Opinion p. 60. But the court's opinion is devoted almost entirely to the subject of control by the Communist Party. The otherwise lawful purposes of an organization do not become unlawful simply because it is controlled by an organization that has the same lawful purposes together with other purposes that are unlawful. Neither the Board nor the court says the preponderance of the evidence supports a conclusion that the Committee is primarily operated for the purpose of aiding the Communist Party to advance the world Communist movement's objectives of overthrowing the government and establishing a totalitarian dictatorship. It seems to me clear that the preponderance of the evidence does not support such a conclusion. I would therefore set aside the Board's order.

I think the government failed to prove by a preponderance of the evidence that the Committee is primarily operated for the purpose of giving aid and support to the Communist Party in advancing *any* objective, even an innocent one.[5] As the

court points out, both the American Committee and the Communist Party attacked and attempted to change our government's policy toward the foreign born, and defended individuals, many of them Communists, who were affected by the policy. But as the court also says, the Committee "enlisted in behalf of many non-Communists." Majority Opinion p. 57. I think the evidence does not show that the Committee was primarily operated for the purpose of giving aid to the Party in advancing any objective, rather than for the purpose of advancing the Committee's own objectives which the Party shared. To treat the Party's control of the Committee, and the overlapping of their memberships and objectives, as proving that the Committee was primarily operated for the purpose of aiding the Party would read the element of purpose out of the Act and make it unnecessary for the government to prove anything more than control.[6]

Our first opinion in Communist Party v. Subversive Activities Control Board, 96 U.S.App.D.C. 66, 109–110, 223 F.2d 531, 574–575 (1954), states that the Board had found secret practices of the Party to have been engaged in for the purpose of concealing the Party's true

S.Ct. 302, 7 L.Ed.2d 256 (1961); Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Rowoldt v. Perfetto, 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed.2d 140 (1957); Gastelum-Quinones v. Kennedy, 374 U.S. 469, 83 S.Ct. 1819, 10 L.Ed.2d 1013 (1963), are not to the contrary. The latest expression of Supreme Court doctrine makes plain that certain civil sanctions may be imposed based on evidence of a "meaningful association" with the Communist Party characterized by awareness of its "distinct and active political nature"; but such sanctions may not rest on evidence of an "association" with the Party—much less with one of its alleged front organizations—characterized by a belief that it is "a group solely trying to remedy unsatisfactory social or economic conditions, carry out trade-union objectives, eliminate racial discrimination, combat unemployment, or alleviate distress and poverty." Gastelum-Quinones v. Kennedy, supra 374 U.S. at 473–474, 81 S.Ct. at 1821–1822, 10 L.Ed.2d 1013.

5. The Board concluded that the Committee operates to serve a two-fold purpose of the Party: "(a) to seek to prevent the denaturalization and deportation of officers and members of the Party, and (b) to win the goodwill of the foreign born and obtain from them adherents to and support for the Party and for Party programs." Report and Order of the Board at 21 (June 27, 1960).

6. Although conduct may sometimes show purpose, I think the Committee's ambiguous conduct in this case does not support an inference of any purpose other than protection of the foreign born. In the *Communist Party* case, on the other hand, the proof included "long-continued, totally unwavering identity of policy lines" between the Party and the Soviet Union, including identical positions on "forty-five major international issues during thirty years." 367 U.S. at 59, 61, 81 S.Ct. at 1391–1392, 6 L.Ed.2d 625.

nature and promoting its objectives, whereas the Party contended its purpose in using the secret practices had been to protect Party members from oppression. We said:

"This question, whether the secret practices of the Party are for the purpose of protecting the liberties of the members or are for the purpose of promoting the objectives of the Party, is a nebulous one. The two purposes may well overlap. In so far as protection of its members from public identification as Communists also promotes the objectives of the Party, both purposes could exist together. In a doubtful situation such as that on this point, we strike the finding as to purpose." [96 U.S. App.D.C. at 110, 223 F.2d at 575.]

I think we should strike the finding as to purpose in the present case. In the former case, the finding as to purpose was a subsidiary one and we affirmed the Board's order without it. In the present case, the American Committee's purpose is a crucial question. But this should not lead us to abandon the principle we formerly adopted.

When the control and the purpose that show an organization to be a Communist front are both established, its lawful activities do not insulate the organization and its members from the sanctions directed against fronts. But lawful activities cannot, in my opinion, make an organization a front.[7] A Communist-front organization is like a man with a false beard. The Subversive Activities Control Act directs us to remove the beard but not without proof that it is false.

7. This court illustrates what seems to me its misunderstanding of the law by characterizing as "of course . . . Communist doctrine" the American Committee's position that laws requiring deportation of present or former Communist aliens "were premised on political opinion and threatened the freedom of all American people to their political opinions." Majority Opinion p. 59. This view of the deportation provisions is

held by many loyal Americans. See also the Board's similar argument:

"Even Abner Green's testimony that in defending Eisler in the deportation proceedings [the American Committee] was supporting the Bill of Rights, was consistent with the position of the Communist Party that 'To advocate action against Communists is to destroy the Bill of Rights.'" Report and Order of the Board at 29.