MATTER OF ATHANASOPOULOS

In Section 246 Proceedings

A–13864002

*Decided by Board December 30, 1971*

(1) Communications between respondent and his attorney for the purpose of perpetrating a fraud against the immigration laws are not privileged communications.

(2) A delay of approximately 3½ years between the time of the Government's first knowledge of respondent's fraudulent marriage and the initiation of rescission proceedings does not constitute a denial of due process of law since rescission proceedings are civil in nature and pursuant to section 246(a) of the Immigration and Nationality Act may be instituted at any time within 5 years after adjustment of status of a person under section 245 of the Act.

(3) Refusal of the special inquiry officer to subpoena certain witnesses and to provide for the taking of depositions in Greece was not a denial of due process where the record clearly reveals that the whereabouts of the witnesses in Greece was unknown and the testimony of the other witnesses to be subpoenaed would be cumulative of competent testimony in the record on the issue in question.

(4) Where the Government has produced evidence of a clear case of fraud and of ineligibility for adjustment of status, and the respondent has refused to testify on matters within his personal knowledge and has failed to rebut the evidence of the Government, rescission of adjustment of status is proper.

ON BEHALF OF RESPONDENT:
Elmer Fried, Esquire
515 Madison Avenue
New York, New York 10022
(Brief filed)

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney

The respondent, a native and citizen of Greece, appeals from an order entered by the special inquiry officer on August 26, 1969 pursuant to the provisions of section 246 of the Immigration and Nationality Act, 8 U.S.C. 1256. The order rescinds an adjustment of his status to that of a permanent resident alien under section 245 of the Act, 8 U.S.C. 1255. Exceptions have been taken to the

finding that the respondent was not in fact eligible for the adjustment of status accorded him.

The respondent originally entered the United States as a nonimmigrant professional soccer player (H–2) through the port of New York on August 9, 1963. He married Marta Pinela, a citizen of the United States, in Jamaica, Queens County, New York on May 12, 1964. A petition to accord the respondent immediate relative status was executed by his citizen wife on May 13, 1964 and approved by the Service on July 2, 1964. The respondent's nonimmigrant status was adjusted to that of a permanent resident alien on August 27, 1964, based upon the approved visa petition. The respondent's marriage to Marta Pinela was terminated by a divorce granted in Mexico on June 22, 1968.

The Notice of Intention to Rescind, served upon the respondent on June 10, 1969, charges that he was not entitled to immediate relative status as the spouse of a United States citizen and was chargeable to the nonpreference portion of the Greek quota which was not then available because his marriage to Marta Pinela "was a sham marriage entered into solely for the purpose of permitting [him] to adjust [his] status to that of a lawful permanent resident of the United States" (Ex. 1).

The respondent, on advice of counsel, declined to testify during the hearing beyond stating his name. Counsel acknowledged that the respondent is an alien and that his status was adjusted to that of a permanent resident as alleged in the Notice of Intention to Rescind.

The Government's case is built primarily upon the testimony of the respondent's former wife, Marta Pinela, and one Angel Luis Collazo, who admitted that he arranged the wedding between the respondent and Marta Pinela (p. 71). Supporting documentary evidence entered in the record consists of a record of the respondent's marriage to Marta Pinela on May 12, 1964, the visa petition (Form I–130) executed by the respondent's former wife and received by the Service on May 21, 1964, the memorandum of the creation of a record of lawful permanent residence (Form I–181) dated August 27, 1964, and the application for adjustment of status (Form I–485) executed by the respondent on June 5, 1964 (Exs. 2, 3, 4 and 5).

The testimony of the respondent's former wife is fully set forth in the opinion of the special inquiry officer and is incorporated herein by reference. A summary of her testimony is as follows: Her marriage to the respondent was arranged solely for immigration purposes by one Angelo Collazo, who informed her that

she would receive $500 as a participant and that there would be no marital obligation on her part to live with the respondent. She further testified that she never lived with the respondent as man and wife. She admitted that the respondent asked her to live with him "two or three times" but she refused because "that wasn't the plan that was offered to me. That isn't what I accepted. Those were not the conditions" (p. 44).

The respondent's wife was questioned as to whether the respondent "ever tried to have sexual relations with [her]." She replied, "He never got fresh with me." She was then questioned as to whether she considered "it getting fresh" if her husband wanted to have sexual relations with her. She replied, "I didn't consider him my husband, otherwise I would have had sexual relations with him" (p. 44).

The witness, Angel Luis Collazo, identified the respondent's former wife as the person for whom he arranged a marriage in 1964 (p. 71). This witness testified that he arranged for the respondent and his former wife to meet at a restaurant "in downtown Manhattan"; that at this meeting in the presence of the respondent, the conversation included a discussion of a monetary consideration for the marriage and an agreement that there would be no cohabitation (p. 74). He further testified that he was present at the marriage ceremony; that immediately following the marriage, they went to the lawyer's office where papers were signed; that thereafter the respondent's wife was paid $500 and "she gave me $100 back" (pp. 76–78).

The respondent, on advice of counsel at the beginning of the hearing, refused to testify on the ground that he was not required to establish the Government's case (pp. 16 and 17). At the close of the hearing after the Government had rested its case, he also claimed the privilege against self-incrimination under the Fifth Amendment (pp. 188, 189). The special inquiry officer states at page 7 in her opinion "... the logical conclusion to be drawn from the respondent's silence based on the contention that to testify might incriminate him is that the testimony, if given, would be adverse to his interest," citing *Matter of O—*, 6 I. & N. Dec. 246 (BIA, 1954).

It is the contention of counsel that the special inquiry officer erred in drawing an adverse inference from the respondent's refusal to testify based on the Fifth Amendment. He claims that the privilege was fairly asserted because the questions of the trial attorney implied that the respondent was suspected of at least a violation of 18 U.S.C. 371, which defines a conspiracy to commit

any offense or to defraud the United States, or any agency thereof in any manner or for any reason. Counsel cites several cases decided by the Supreme Court [1] in support of his position.

We agree with counsel that the drawing of adverse inferences from a claim of Fifth Amendment privilege has been circumscribed by recent decisions of the Supreme Court, *supra,* footnote 1. We need not reach the issue of whether, on the peculiar facts of this case, the special inquiry officer erred in drawing an adverse inference from the respondent's refusal to testify. Here we have direct and uncontroverted evidence that the respondent's marriage to a citizen of the United States was a sham. The respondent's former wife testified that she never lived with the respondent in a marital relationship and that her marriage was arranged for immigration purposes. The testimony of the arranger, Collazo, is to the same effect. Their testimony is credible and remains unrebutted by the respondent. We conclude, without relying on the respondent's failure to testify, that the essential facts of a sham marriage are clearly, convincingly and unequivocally established quite apart from any inference drawn by the special inquiry officer. Cf. *Vlisidis* v. *Holland,* 245 F.2d 812, 814 (3 Cir., 1957). Since we reach this conclusion separate and apart from any adverse inference drawn by the special inquiry officer, we need not deal with counsel's objections.

Counsel challenges the special inquiry officer's ruling that the information furnished to the Immigration Service by the respondent's former attorney was not a violation of the attorney-client privilege and that the evidence derived from that information is therefore admissible in evidence. The special inquiry officer stated in her opinion that the attorney-client privilege does not extend to communications between an attorney and client where the client's purpose is the furtherance of a future intended crime or fraud.

The facts concerning this phase of the case have been fully discussed in the opinion of the special inquiry officer and the brief submitted by counsel. Briefly, they establish that one Peter K. Timon, whose signature appears as a notary public on the petition (Form I-130, Ex. 3) submitted by the respondent's former wife, appeared voluntarily in the office of the Immigration Service at New York on January 4, 1966 and on this occasion surrendered voluntarily a list of his immigration clients. Mr. Timon

---

[1] *Griffin* v. *California,* 380 U.S. 609, 14 L. Ed. 2d 106 (1965); *Spevack* v. *Klein,* 385 U.S. 511, 17 L. Ed. 574 (1967); *Gastelum-Quinones* v. *Kennedy,* 374 U.S. 469, 10 L. Ed. 2d 1013 (1963).

again appeared voluntarily in the Immigration office on July 13, 1966, and surrendered voluntarily some 16 powers of attorney including a power of attorney executed by the respondent's former wife (pp. 124, 163, 172 and Exs. 2 and 3 for identification). There is evidence of record that the powers of attorney were executed by the respective petitioning wives for the purpose of eliminating the necessity of contacting the "immigration wife" when the time arrived for obtaining an uncontested Mexican divorce (p. 140). There is a statement on Exhibit 4 for identification that most of the cases were known to the Government prior to the submission of the list by Attorney Timon.

We have carefully considered counsel's contention that the evidence upon which this proceeding is based is tainted and may not be used because it is a violation of the attorney-client privilege and the Fourth Amendment prohibition against illegal search and seizure. There is evidence of record that Attorney Timon was in possession of a power of attorney which was signed by the respondent's former wife in his office at the time she signed the visa petition submitted by him in the respondent's case. When this evidence is considered with the testimony of the two immigration officers who were concerned with the investigation that preceded the institution of rescission proceedings against the respondent, we are convinced that Attorney Timon knew or should have known that his services in behalf of the respondent were for the purpose of perpetrating a fraud against the immigration laws. The Supreme Court has said that, "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law," *Clark* v. *United States*, 289 U.S. 1, 15, 77 L. Ed. 993, 1000 (1933).

The test for the loss of the attorney-client privilege was stated by the Court in *Clark, supra,* 289 U.S. 15, 77 L. Ed. 1000, as follows:

To drive the privilege away there must be "something to give color to the charge," there must be "prima facie evidence that has some foundation in fact". . . . When that evidence is supplied, the seal of secrecy is broken.

We are satisfied that the evidence on this issue meets the aforestated test. We find no error in the special inquiry officer's ruling that the communications between the respondent and his attorney are not protected by the attorney-client privilege under the circumstances presented by this case.

Counsel asserts that the respondent was prejudiced and denied due process of law because of the unreasonable delay between the Government's first knowledge of the alleged fraudulent marriage

831

and its action in starting these proceedings. Counsel asserts that the Government learned from Attorney Timon on January 4, 1966 that the respondent might have obtained his permanent residence by a sham marriage but took no action until the Notice to Rescind was mailed to the respondent on June 10, 1969. It is the position of counsel that during this delay of nearly three and one-half years the memories of witnesses had faded, circumstances had changed and some witnesses were unavailable.

The Sixth Amendment provides in part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." This is a civil proceeding brought under section 246(a) of the Immigration and Nationality Act. Under this statute the Attorney General may institute rescission proceedings "*at any time* within five years after the status of a person has been otherwise adjusted under the provisions of section 245 . . . of this Act . . . ." (Emphasis supplied.)

We find no support in the cases cited by counsel in his brief [2] for his argument that the respondent has been denied his constitutional rights by reason of the delay in the initiation of rescission proceedings. Three of the cited cases are concerned with appeals from convictions for violations of the federal narcotic laws and are criminal proceedings as distinguished from civil proceedings.

The case of *Pierno* v. *INS, supra,* footnote 2, is not relevant to the case before us. The *Pierno* case concerns a finding of statutory ineligibility for section 245 relief based solely upon an automatic revocation of visa approval pursuant to 8 CFR 205.1(a)(2) because of the intervening death of the petitioning citizen spouse. The Service argued that the automatic revocation of visa approval pursuant to the regulations precluded the grant of relief under section 245.

The court held that since the authority for the automatic revocation regulation was derived from section 205 of the Act, a permissive statute granting the Attorney General discretion in determining what shall constitute good and sufficient cause for revocation, there could be no "wooden application of rules for automatic revocation." The court in its review of the evidence noted that the petitioning spouse had died during the eight months' stay of the section 245 proceeding by the Service while awaiting final disposition of an annulment proceeding brought by the peti-

---

[2] *Nickens* v. *United States,* 323 F.2d 808 (D.C. Cir., 1963); *Ross* v. *United States,* 349 F.2d 210 (D.C. Cir., 1965); *United States* v. *Sanchez,* 361 F.2d 824 (2 Cir., 1967); *Pierno* v. *INS,* 397 F.2d 949 (2 Cir., 1968).

tioner's son. The court by way of dictum said at page 951 that the beneficiary ". . . need not be penalized as a result of events occurring during an unusually long investigation which are totally *unrelated to that investigation.*" (Emphasis supplied.) The record establishes to our satisfaction that the events which occurred during the three and one-half year period referred to by counsel were directly related to the investigation of the respondent's eligibility for adjustment of status under section 245 of the Act. Cf. *U.S. ex rel. Circella* v. *Sahli,* 216 F.2d 33, 39 (7 Cir., 1954), cert. denied 348 U.S. 964.

Counsel contends that the respondent was deined due process of law by reason of the special inquiry officer's refusal to subpoena certain witnesses requested by the respondent and to provide for the taking of depositions in Greece. Counsel argues that the refusals were in all cases not based on considerations as to whether the testimony was likely to be relevant, material or necessary, but on whether the witnesses were immediately available in order to meet the deadline for the running of the five-year statute of limitation provided by section 246(a) of the Act.

8 CFR 287.4(a)(2) provides the special inquiry officer with discretion ". . . upon application of . . . the alien . . . [to] . . . issue subpoenas requiring the attendance of witnesses or for the production of . . . other documentary evidence, or both." The regulation also provides that the party applying for a subpoena shall be required, "as a condition precedent to its issuance, to state in writing or at the proceeding what he expects to prove by such witnesses or documentary evidence, and to show affirmatively that he has made diligent effort without success to produce the same. Upon being satisfied that a witness will not appear and testify or produce documentary evidence and *that his evidence is essential,* the . . . special inquiry officer shall issue a subpoena." (Emphasis supplied.)

We have carefully reviewed the record of counsel's requests for the production of witnesses and the taking of depositions in Greece. Following a statement by the trial attorney that "The government rests" (p. 90), counsel for the respondent stated for the record that he would "like the production of certain witnesses, some under the control of the government, some not" (p. 94). Among the witnesses named by counsel are Attorney Peter Timon, the respondent's former counsel, an Assistant United States Attorney alleged to have been in charge of prosecution of this case, each investigator who investigated the case, and a Mr. Kaparonis who allegedly participated in the "conversations, acts

and agreements" when the marriage was arranged (p. 94). During the discussion which followed counsel's request, we find no statement on the part of counsel as to what he expects to prove by the production of the witnesses, nor is there any affirmative showing on the part of counsel that prior to this request he had made a diligent effort without success to produce the witnesses (pp. 95–101).

During the hearing of August 19, 1969, counsel requested the issuance of a subpoena to compel the appearance of Attorney Timon, since he assumed that "Mr. Timon has no intention of voluntarily appearing" pursuant to counsel's request forwarded by mail on August 4, 1969 (pp. 105–106). Counsel at this time also requested the taking of depositions from two witnesses who were overseas and whose testimony he considered crucial for the respondent's defense (p. 106). Concerning the subpoena for Attorney Timon, the special inquiry officer referred to an "off the record discussion" at counsel's request during the hearing of August 1, 1969. The special inquiry officer stated for the record that pursuant to this discussion, it was her understanding that counsel was interested in the testimony of Attorney Timon in order to determine whether it was from Mr. Timon or from his records "that the Service investigation in this matter resulted" (p. 108). We are satisfied after thoroughly considering the exchange between counsel and the trial attorney (pp. 109–113), and the testimony of the supervisory inspector of the Frauds Section in the New York office of the Immigration Service (pp. 139–185) that the respondent's case had been identified from Service records prior to the receipt by the Service of a record of Mr. Timon's clients (pp. 141, 150). We find no error on the part of the special inquiry officer in refusing counsel's request to adjourn the hearing for the purpose of having Attorney Timon and the two investigators appear as witnesses (pp. 133, 134, 135) since there was competent evidence on this issue in the record.

Counsel during the hearing of August 19, 1969 requested an adjournment in order that he might fly to Greece for the purpose of taking depositions from the respondent's uncle and another man named "Jimmy [Kaparonis]." Counsel stated that the two witnesses "could contradict the Government testimony" since they "were present at the time of the alleged conversations of these Government witnesses" (p. 135). Counsel did not specify what "Government testimony" these witnesses would contradict. He made no attempt to show affirmatively that he had made diligent effort without success to produce the witnesses. Counsel takes the

position that the Government should assist in locating the witnesses (p. 107).

An alien in a rescission proceeding must be afforded due process, including a fair hearing. We find no substance to counsel's claim that the special inquiry officer erred in denying his request to subpoena certain witnesses and to take depositions in Greece. The record clearly reveals that the whereabouts of the two witnesses in Greece was unknown and that the testimony of Attorney Timon and the two investigators who were not available would be cumulative of testimony proffered by the witnesses Whalen and Spivack, both employees of the Immigration Service. Failure to produce for crossexamination witnesses who cannot be found or whose presence cannot be procured does not make this proceeding unfair, *Navarrette-Navarrette* v. *Landon,* 223 F.2d 234, 237 (9 Cir., 1955), cert. denied 351 U.S. 911 (1956); *U.S. ex rel. Impastato* v. *O'Rourke,* 211 F.2d 609, 611 (8 Cir., 1954), cert. denied 348 U.S. 827 (1954). There is no showing that the hearing was unfair, and we find no error.

Counsel contends that the respondent is immune from rescission proceedings by reason of section 241(f) of the Immigration and Nationality Act since he is now married to and living with a citizen of the United States. Section 241(f) provides a waiver of deportability in the case of an alien who was excludable at the time of entry as one who had procured a visa or entry into the United States by fraud or misrepresentation if such alien is the spouse, parent or child of a United States citizen or an alien lawfully admitted for permanent residence. Counsel's argument is based on the premise that Congress did not intend to have its grant of immunity under section 241(f) depend on which administrative procedure, i.e., a section 245 adjustment as opposed to an entry with an immigration visa, was used to acquire the residence status that Congress intended to protect. Counsel cites no authority for his position.

We have considered the question of whether section 241(f) is available in rescission proceedings. We held in *Matter of Alemis,* 12 I. & N. Dec. 456 (BIA, 1967), that section 241(f) by its very terms and the Supreme Court's decision in *INS* v. *Errico,* 385 U.S. 214 (1966), is limited solely to a deportation proceeding and is not applicable to a rescission proceeding under section 246 of the Act. The proceeding before us is not a deportation proceeding. See also, *Ferrante* v. *INS,* 399 F.2d 98 at pp. 104, 105; *Fojon-Casal* v. *Attorney General,* Civ. No. 2063-68 (unreported

D.C., D.C.); and *Matter of Vilanova-Gonzalez,* Interim Decision No. 2008 (BIA, 1969).

Counsel contends that the record does not establish by clear, convincing and unequivocal evidence that the respondent's marriage to Marta Pinela was a sham, entered into solely for the purpose of permitting him to adjust his immigration status to that of a lawful permanent resident alien. Counsel asserts that the Government never established that the respondent was a knowing participant in the marriage fraud. He maintains that without such proof the Government has failed to establish a prima facie case and for this reason the respondent's silence may not be used to bolster the insufficiency of the Government evidence. Counsel cites the case of *Gastellum-Quinones* v. *Kennedy,* 374 U.S. 469, 479 (1963), in support of his argument.

We find no substance to counsel's argument that the Government has failed to establish a prima facie case because there is no showing that the respondent was a knowing participant in the marriage fraud. The testimony of the respondent's former wife and the arranger, Collazo, that the respondent was present at the time the sham marriage was arranged is uncontroverted. The arranger, Collazo, testified that the respondent's uncle spoke to the respondent in "Greek" during the meeting at which the marriage was arranged (p. 88). There is no reason why we should not conclude that the uncle truthfully informed the respondent in Greek just what was taking place, *i.e.,* that a sham marriage was being arranged for him with the woman who was present, in order that his immigration status could be adjusted. We are satisfied from the testimony of the arranger concerning events which followed the first meeting between the respondent and his former wife that he (respondent) knew full well that the marriage was solely for immigration purposes (pp. 75, 77, 79–81). For example, the respondent permitted the arranger, Collazo, to place around his apartment women's clothing furnished by his uncle for the purpose of making it appear that his wife was residing there (pp. 78, 79). It is inconceivable under the circumstances that the respondent could not have known what was going on. Accordingly, the Supreme Court's decision in *Gsatelum-Quinones, supra,* has no application to the respondent's case.

It is the function of the special inquiry officer and on appeal the function of this Board to make an evaluation and to reach a determination as to whether the evidence is of sufficient quality and substantiality to support the rationality of the order of res-

cission. Cf. *D'Andrea* v. *INS*, 335 F.2d 377 (6 Cir., 1964), cert. denied 379 U.S. 999 (1965) ; *Matter of Lugo-Guadiana*, 12 I. & N. Dec. 726 (BIA, 1968). The respondent in this proceeding was not deprived of an opportunity to produce evidence in refutation of the testimony of his former wife and the witness, Collazo. Cf. *Sercerchi* v. *Ward*, 27 F. Supp. 437, 440 (D. Mass., 1939) and cases cited. Their unrefuted testimony is candid, unequivocal and credible.

The good faith of the marital relationship is the very essence of this rescission proceeding and by its very nature is within the personal knowledge of the respondent. His failure to rebut the testimony of the Government witnesses does not diminish its quality when, as here, the case is clear cut. We conclude that the special inquiry officer has made a "fair assessment of the record." Cf. *Peurifoy* v. *Commissioner*, 358 U.S. 59, 61 (per curiam 1958). There is clear, unequivocal and convincing evidence that the respondent was not in fact eligible for adjustment of status under section 245 of the Immigration and Nationality Act, as amended. We affirm the order entered by the special inquiry officer and will dismiss the appeal.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.